STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v. JANET PILLOT, DEFENDANT–APPELLANT.

Argued September 14, 1988—Decided July 6, 1989.

559

560

*Marcia Blum,* Assistant Deputy Public Defender, argued the cause for appellant (*Alfred A. Slocum,* Public Defender, attorney).

*Janet Flanagan,* Deputy Attorney General, argued the cause for respondent (*Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.,

The defendant, Janet Pillot, appeals what she considers to be an excessive and unfair sentence imposed by the Superior Court, Law Division, Passaic County. When she filed her appeal in the Appellate Division, she challenged this sentence as well as another that had been imposed shortly before by the Superior Court, Law Division, Bergen County. The sentences covered a series of similar crimes committed by defendant in both counties. During the oral argument before the Appellate

Division, defendant contended that the sentences were invalid because they were excessive and also because there was an "unjustified, gaping disparity" between them that should have been avoided by consolidation of the sentencing proceedings. The Appellate Division rejected these arguments and upheld the sentences.

The defendant now limits her challenge only to the validity of the longer of the two sentences, that imposed by the court in Passaic County. She contends not only that this sentence is excessive, but also that it is "disparate" when compared to the Bergen County sentence, and that she should have been sentenced on all of the underlying crimes in a single proceeding. The appeal thus presents initially the issue whether sentencing guidelines were properly applied by the sentencing court on an adequate record. Further, it poses the broader issue of the validity and adequacy of current procedures relating to the consolidation and joinder of sentencing proceedings.

I.

Within a period of approximately nine weeks, Janet Pillot, then twenty-three years old, engaged in six armed robberies. The first two were committed in Passaic County on February 24 and April 4, 1986. The next three occurred on April 10 and 17 in Bergen County, and the sixth on April 26 in Passaic County. All of these offenses were similar. The defendant and a male companion would drive through a parking lot, usually in a shopping area, and park their car. Defendant would leave the car and approach a female in the parking lot. Using an unloaded BB gun, defendant would demand the victim's money at gunpoint. On completing the robbery, defendant and her cohort would flee the scene. Defendant was indicted in Bergen County on ten counts and in Passaic County on twelve counts for these crimes, the charges encompassing armed robbery, weapons offenses, and automobile theft.

On July 29, 1986, defendant appeared in Superior Court, Law Division, Bergen County. She retracted her previous plea of not guilty and entered a plea of guilty to three counts of first-degree robbery in exchange for the State's recommendation of a thirty-year maximum term, limiting the Graves Act exposure to ten years, and dismissal of the remaining counts.

Before she was sentenced in Bergen County, defendant appeared in Superior Court, Law Division, Passaic County. She entered a plea of guilty to three counts of first degree robbery in exchange for the State's recommendation that any custodial sentence imposed not exceed twenty-years imprisonment, with a possible ten-year period of parole ineligibility, to run concurrently with any sentence imposed on the conviction in Bergen County, and dismissal of the remaining counts of the indictment.

Defendant then appeared for sentencing in Bergen County and argued for the imposition of concurrent terms, with a presumptive sentence of fifteen years and five years parole ineligibility. The court imposed this sentence, along with the payment of violent-crime penalties. It considered as aggravating factors the nature of the offense, the risk that defendant might commit another offense, and the need to deter defendant and others from violating the law, *N.J.S.A.* 2C:44–1a(1), (3), (9), and further noted that the seriousness of the crime triggered a presumption of imprisonment under *N.J.S.A.* 2C:44–1d. The court found as mitigating factors that defendant had no prior criminal record and, in light of her confession, that she had cooperated "to a certain extent" with law-enforcement authorities. The court further reasoned that although there were similar charges pending in another jurisdiction, Passaic County, this was defendant's first offense, that her employment record evidenced her willingness to work, and that the offenses occurred within a short span of time. The court determined that the aggravating factors did not outweigh the mitigating factors, justifying the imposition of the presumptive term and

the minimum period of parole ineligibility under the Graves Act: fifteen years and five years parole ineligibility.

Following the imposition of sentence in Bergen County, defendant was sentenced in Passaic County on October 3, 1986. The court was unconvinced that there were any mitigating factors referable to her age, the absence of a criminal record, or her cooperation with the authorities; it also noted statements made by three of the victims indicating their continuing emotional distress resulting from these crimes. The court found: "[u]nder [*N.J.S.A.*] 2C:44–1, aggravating circumstances, Sections 1, 3, 6, and 9. Mitigating circumstances, none." Because the offenses were crimes of the first degree and, along with the similar offenses in Bergen County, constituted a continuing pattern of criminal conduct, the court concluded that defendant was a danger to the community, warranting the maximum sentence. The court further noted that the recommended sentence was within the terms of the negotiated plea agreement. Accordingly, the court sentenced defendant to three concurrent twenty-year custodial terms with ten years of parole ineligibility, and ordered payment of restitution and violent-crime penalties.

As noted, defendant originally appealed both sentences. These were affirmed by the Appellate Division, which found no abuse of discretion by the court below, but rather that "[defendant] got exactly what she bargained for in this case." We granted defendant's petition for certification. 110 *N.J.* 301 (1988). She now challenges only the Passaic County sentence on grounds of excessiveness attributable to a misapplication of sentencing guidelines and unfairness because of disparity.

## II.

For each of the crimes committed in Passaic County, defendant received the maximum sentence possible for a first-degree armed robbery committed with a gun, namely, a twenty-year term with a ten-year period of parole ineligibility. She contends

initially that this sentence, although within the statutory limits, was an abuse of discretion because the sentencing court did not follow or properly apply the sentencing guidelines of the New Jersey Code of Criminal Justice, and that as a result, the sentence is excessive and arbitrary.

Appellate courts are extremely deferential in their review of a trial court's exercise of sentencing discretion. *State v. Ghertler*, 114 *N.J.* 383 (1989). We are guided in our review of the sentence by a three-pronged test enunciated in *State v. Roth*, 95 *N.J.* 334, 363–64 (1984). Appellate review of a sentencing decision requires a determination of whether the appropriate sentencing guidelines were followed, whether there was sufficient evidence to support the sentencing court's finding of fact, and "whether in applying those guidelines to the relevant facts the [sentencing] court clearly erred by reaching a conclusion that could not have reasonably been made upon a weighing of the relevant factors." *Id.* at 366.

The sentencing court found several aggravating factors. In finding the aggravating factor of *N.J.S.A.* 2C:44–1a(1), the court mentioned that the offense was particularly heinous because a gun was used to rob unsuspecting people. As defendant points out, however, pursuant to *N.J.S.A.* 2C–15–1b, the use of the unloaded BB gun elevated the robbery offense from a second-degree offense to a crime of the first degree and, as such, the severity of the criminal conduct through the use of a gun has been factored into the offense with which defendant is charged. Hence, the court may not again consider or double-count the use of a firearm as an aggravating factor. *State v. Jarbath*, 114 *N.J.* 394 (1989).

The court also was impressed by evidence of the threats that defendant made in some instances and the statements of some of the victims disclosing continuing emotional distress. However, these circumstances would appear more probative of the factor under *N.J.S.A.* 2C:44–1a(2), "[t]he gravity and serious-

ness of harm inflicted on the victim," to which the court made no reference.

■ Defendant's prior conviction in Bergen County also constituted an aggravating factor under *N.J.S.A.* 2C:44–1a(6). Although two of the Bergen County offenses that constitute defendant's prior conviction were committed on April 10 and 17, after the commission of the first two Passaic County offenses, the Bergen County conviction was permissibly considered as a prior criminal record. *See State v. Hawks*, 114 *N.J.* 359 (1989) (prior conviction can be based on a subsequent offense for Graves Act sentencing purposes). Moreover, defendant's continuing course of criminal conduct from February to April was a sufficient basis for the court's determination that there was a risk that defendant might commit another similar offense, meeting the factor of *N.J.S.A.* 2C:44–1a(3), and that there was a need to deter defendant and others from engaging in this type of criminal conduct. *N.J.S.A.* 2C:44–1a(9).

The Passaic County court found no mitigating circumstances. This determination is disturbing, particularly in light of the Bergen County court's determination that the evidence established two mitigating circumstances: defendant's unblemished record both as a juvenile and as an adult, *N.J.S.A.* 2C:44–1b(7), and her cooperation, "to a certain extent," with law-enforcement authorities, *N.J.S.A.* 2C:44–1b(12). However, at the time of the Passaic County sentencing, the Bergen County conviction was part of defendant's record; further, her cooperation with authorities was not unequivocal. Therefore, the differences between the two determinations regarding mitigating factors are not irreconcilable; although there is evidence that would support a finding of mitigating factors, the failure to find them on this record is not an abuse of discretion.

Another fundamental aspect of the sentencing process is the requirement that judges clearly articulate their reasons for imposing a sentence. *See, e.g., State v. Dunbar*, 108 *N.J.* 80, 94 (1987). The explanation of the balancing of aggravating and

mitigating factors with regard to imposition of sentences and periods of parole ineligibility is particularly important. *State v. Baylass*, 114 *N.J.* 169, 173–74 (1989); *State v. Kruse*, 105 *N.J.* 354, 359–60 (1987). As suggested by our earlier observations, the court's statement of reasons could have been somewhat clearer and more complete. It is, however, possible in the context of this record to extrapolate without great difficulty the court's reasoning. The sentence imposed falls within the discretionary parameters of the Code and does not shock the judicial conscience. *Roth, supra*, 95 *N.J.* at 364–65. Further, the sentence imposed conformed to the plea bargain, and hence is presumed reasonable. *See State v. Sainz*, 107 *N.J.* 283, 294 (1987).

In sum, the several deficiencies relating to the sentencing under the criteria of the Code do not serve as a basis for its reversal.

## III.

The defendant presents the additional argument that the sentence imposed is invalid because it is disparate and inconsistent with the sentence imposed for the similar Bergen County offenses. This disparity could have been obviated, defendant argues, if the sentence had been imposed according to procedural requirements relating to the joinder or consolidation of sentencing proceedings. Defendant specifically asserts that *N.J.S.A.* 2C:1–8b and *Rule* 3:15–1(b) required that the indictments presented in Passaic and Bergen Counties should have been joined in a single prosecution, and that on the respective convictions, the ensuing sentences should have been handled in a single sentencing proceeding. According to defendant, the matter before the Court, presented as plain error, is "precisely the situation the statutory and regulatory compulsory joinder provisions were meant to address."

The joinder rule on which defendant relies, *Rule* 3:15–1(b), provides in relevant part that

a defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of commencement of the first trial and are within the jurisdiction and venue of a single court.

The relevant statutory provision, *N.J.S.A.* 2C:1–8(b), mirrors this Rule.

With regard to the application of the standards for joinder, the State does not deny that the prosecutors in both jurisdictions were aware of the charges pending in each county. Further, even though the offenses were not within the venue of a single court, all the charges could have been heard in either court pursuant to the venue provisions of *Rule* 3:14–1(a). The critical question, therefore, in terms of the application of the standards of the joinder Rule, is whether defendant's criminal activity during the nine-week period constitutes "criminal offenses based on the same conduct or arising from the same criminal episode."

Although defendant characterizes her criminal conduct as the result of a short period of aberrant behavior, she committed six different armed robberies against six different victims in six different locations at different times over a nine-week period.[1] These circumstances do not indicate the crimes are the product of a continuing plan or common scheme or that they constitute a single episode. The only circumstance that serves to make these crimes comparable and ties them together is the *modus operandi* used by the defendant—their manner of execution was similar. Even applying broad standards of "flexibility" in determining whether separate criminal incidents can be fused into a single criminal episode, *see, e.g., State v. Best,* 70 *N.J.* 56, 62–63 (1976); *State v. Whipple,* 156 *N.J.Super.* 46 (App.Div. 1978), the offenses here are factually distinct in terms of time, place, and victim, if not manner. We would not, therefore, conclude that the joinder of these offenses was required, although it does not follow that joinder would be an impermissi-

---

[1]Five of the six robberies occurred within a twenty-two-day period.

ble exercise of discretion in these circumstances. We are nonetheless satisfied that the failure to join these offenses does not constitute a clear violation of the mandatory-joinder standards.

■ Defendant also argues that notwithstanding the prosecutor's failure to join the charges in a single proceeding pursuant to *N.J.S.A.* 2C:1–8b and *Rule* 3:15–1(b), the charges should have been consolidated into a single proceeding for plea and sentencing purposes pursuant to *Rule* 3:25A–1. This consolidation rule provides:

> Notwithstanding the provisions of R. 3:14, upon a conviction after trial or upon the entry of any plea of guilty or non vult pursuant to R. 3:9–2, or upon dismissal of an indictment, accusation or complaint or counts thereof pursuant to R. 3:25–1, upon application of the prosecutor of the county in which the disposition occurred, with the consent of the defendant and the prosecutors of all other counties in which charges are to be disposed of or after opportunity to be heard concerning same given to the prosecutors of such other counties, the judge may accept a plea of guilty or non vult as provided by R. 3:9–2, or may dismiss pursuant to R. 3:25–1, any other indictment, accusation or complaint, or any count thereof, pending in any county or municipality in the State.

Defendant stresses the significant differences between joinder under *Rule* 3:15–1(b) and consolidation under *Rule* 3:25A–1, pointing out in particular that "the former is only applicable if the separate charges are an aspect of the same criminal episode, while the latter may be invoked regardless of whether the separate charges are related." Defendant urges that the consolidation Rule be applied in these circumstances, and proposes that the Passaic County sentence be vacated and the matter remanded to Bergen County for resentencing for both convictions. The State maintains that defendant's position frustrates efficiency concerns that underlie the intent of *Rule* 3:25A–1. It also asserts that defendant is procedurally barred by *Rule* 3:10–2, which imposes a waiver on the failure to interpose before trial "objections based on defects in the institution of the prosecution."

Here, no application was made for consolidation nor did the defendant request that such an application be made. If, with

the appropriate consent of the defendant and the other county prosecutor, such an application had been made by the county prosecutor for the consolidation of pleas and sentencing, the trial court would have been authorized to consolidate these proceedings. Indeed, we believe that if the Rule were sought to be invoked in these circumstances, it would have fairly required such consolidation. However, apart from any putative waiver under *Rule* 3:10–2, there is no escape from the fact that the Rule was not invoked. Consequently, defendant cannot demonstrate on this record that the failure to consolidate the plea and sentencing proceedings violated *Rule* 3:25A–1.

## IV.

■  The defendant contends, finally, that even in the absence of express authority for the consolidation of her sentences at the request of the defense under the applicable rules of procedure, such consolidation should be required in order to effectuate the overriding sentencing goals of uniformity and consistency under the Code. The issue thus posed is whether, under the circumstances presented by this case, the defendant should have had the opportunity to be sentenced for her several offenses in a single proceeding by a single judge. We believe so.

We are firmly committed to the goal of achieving greater uniformity in sentencing. In *State v. Roth, supra,* 95 *N.J.* 334, this Court discussed the importance of uniform and proportionate sentencing in light of the sentencing standards instituted by the Legislature in the Code of Criminal Justice. We found that "[t]he central theme of the Code's sentencing reforms is the replacement of the unfettered sentencing discretion of prior law with a structured discretion designed to foster less arbitrary and more equal sentences." *Roth, supra,* 95 *N.J.* at 345. The direction toward greater consistency is found in the Code's focus on "offense-oriented, non-individualized determinate sentencing." *Roth, supra,* 95 *N.J.* at 349; *see* von Hirsch, "Re-

cent Trends in American Criminal Sentencing Theory," 42 *Md. L.Rev.* 6 (1983); Weigand, "Sentencing in West Germany," *id.* at 37 (comparative criminal justice symposium). This clear direction can be instructively contrasted with the pre-Code sentencing philosophy, under which "the unfettered discretion of the officials involved" engendered enormous potential for sentencing disparity. *Roth, supra,* 95 *N.J.* at 346 (quoting Hoffman and Stover, "Reform in the Determination of Prison Terms: Equity, Determinancy, and the Parole Release Function," 7 *Hofstra L. Rev.* 89, 96 (1978), *quoted in Bullington v. Missouri,* 451 *U.S.* 430, 443 n. 16, 101 *S.Ct.* 1852, 1860 n. 16, 68 *L.Ed.* 2d 270, 282 n. 16 (1981)). As underscored in *Roth,* "[t]he paramount goal of sentencing reform was greater uniformity. To that end, the Code channels discretion. Uniformity could not be achieved within the framework of pre-Code sentencing processes." 95 *N.J.* at 369.

The Code delineates no clear hierarchy of sentencing purposes; indeed, it "gives conflicting signals about the philosophical justification for punishment, and the language of the Code does not point unflinchingly in one direction." *State v. Hodge,* 95 *N.J.* 369, 379 (1984) (citation omitted). Nevertheless, the shift in emphasis from individualization to proportionality is unmistakable. One of the sentencing purposes of the Code is "[t]o safeguard offenders against excessive, disproportionate or arbitrary punishment." *N.J.S.A.* 2C:1–2b(4).[2] We have

---

[2]*N.J.S.A.* 2C:1–2b provides, in relevant part, that

[t]he general purposes of the provisions governing the sentencing of offenders are:

(1) To prevent and condemn the commission of offenses;

(2) To promote the correction and rehabilitation of offenders;

(3) To insure the public safety by preventing the commission of offenses through the deterrent influence of sentences imposed and the confinement of offenders when required in the interest of public protection;

(4) To safeguard offenders against excessive, disproportionate or arbitrary punishment;

(5) To give fair warning of the nature of the sentences that may be imposed on conviction of an offense;

stressed that the philosophical orientation of the Code is conducive to uniformity and consistency because it most closely resembles a "model for sentencing based on notions of proportionality and desert." *Roth, supra,* 95 *N.J.* at 355 (quoting von Hirsch, "Utilitarian Sentencing Resuscitated: The American Bar Association's Second Report on Criminal Sentencing," 33 *Rutgers L. Rev.* 772, 773).

The Court has consistently acknowledged the dominance, if not paramountcy, of uniformity as one of the Code's premier sentencing goals:

> The Code is a restraint upon the discretion of judges in individual cases. [T]here can be no justice without a predictable degree of uniformity in sentencing. We must not forget that the driving force behind sentence reform was the tragic disparity in sentences inflicted upon defendants under the old model. The loss of unfettered discretion may be the price of evenhanded justice. [*State v. Hodge, supra,* 95 *N.J.* at 379 (citations omitted).]

This sentencing priority is realized through a structured scheme of presumptive sentences applicable to defined classes of crime, and through limitations on judicial discretion, primarily in terms of statutorily-prescribed aggravating or mitigating factors. *State v. Jarbath, supra,* 114 *N.J.* at 400.

The Court has sounded the theme of uniformity and proportionality in a variety of sentencing contexts. In *State v. Yarbough,* 100 *N.J.* 627 (1985), *cert.* den. *sub nom. Yarbough v. New Jersey,* 475 *U.S.* 1014, 106 *S.Ct.* 1193, 89 *L.Ed.*2d 308 (1986), the Court addressed the problem of assigning concurrent or consecutive sentences for multiple offenses. It stressed that "sentencing courts should be guided by the Code's paramount sentencing goals that punishment fit the crime, not the criminal, and that there be a predictable degree of uniformity in sentencing." 100 *N.J.* at 630.

> [W]e must strive for some degree of proportionality. *Fair and Certain Punishment* ... is not just the title of a book.... We repose the paramount

---

(6) To differentiate among offenders with a view to a just individualization in their treatment; and

(7) To advance the use of generally accepted scientific methods and knowledge in sentencing offenders.

responsibility for fair and certain sentencing justice in our trial courts. They share the goal of our appellate courts that there be a predictable degree of uniformity in sentencing. [*Id.* at 647.]

We have stressed that "the Code's goals of enhancing fairness and uniformity in the exercise of sentencing discretion" are met by a focus on the "crime committed" and its corresponding statutory presumptive term. *See, e.g., State v. O'Connor,* 105 *N.J.* 399, 405–06 (1987). Application of presumptive terms comports with "the Code's policy of enhancing sentencing uniformity through the channeling of judicial discretion." *State v. Hartye,* 105 *N.J.* 411, 417 (1987).

The sentencing court's findings, as required under the Code, also serve the ends of uniformity:

Uniformity in sentencing is furthered ... by the requirement that the court clearly identify the relevant sentencing factors and describe how it balanced them. The legislative goal is to channel judicial discretion so that similar defendants will receive similar sentences. [*State v. Kruse, supra,* 105 *N.J.* at 360.]

"Principled sentencing lies at the heart of an effective justice system," and guided appellate review predicated on the record and the trial court's explanation of the sentence also constitutes an important element in the "continue[d] evolution towards a [uniform] law of sentencing." *State v. Dunbar, supra,* 108 *N.J.* at 97 (citation omitted).

Our state's concern over the evils of sentencing inconsistency and disparity has been longstanding. Indeed, these concerns were addressed in studies of sentencing uniformity undertaken in certain counties as early as 1933 and 1940. Report of Coleman Committee on Sentencing Disparity 1 (1983) (hereafter, Coleman Report). In 1965, the Supreme Court, through the Administrative Office of the Courts, issued a directive to the Assignment Judges to assure consistency and proportionality in sentencing for gambling offenses by requiring those guilty of such offenses to be sentenced by a single judge in each county. *State v. De Stasio,* 49 *N.J.* 247 *cert.* den., 389 *U.S.* 830, 88 *S.Ct.* 96, 19 *L.Ed.*2d 89 (1967). In upholding the constitutionality of this directive, the Court stressed that it was issued pursuant to

Article VI, Section II, paragraph 3 of the New Jersey Constitution. The Court underscored the need to achieve sentencing consistency and certainty with respect to these kinds of offenses.[3] The Court presaged the dominant sentencing philosophy of the Code of Criminal Justice: "[i]f a defendant receives the punishment his offense warrants, he has received his due." 49 *N.J.* at 260. The durability of the principle of sentencing uniformity is confirmed by our current practice that continues single-judge sentencing of gambling offenders in each county, prompting the Appellate Division, twenty years later, to acknowledge the prescience of the *De Stasio* decision. *See State v. Pych*, 213 *N.J.Super.* 446, 462–63 (1986).

The underlying purpose of the current consolidation Rule, *Rule* 3:25A–1, also comports with promotion of the Code's goals of uniformity and proportionality. The Criminal Practice Committee, which proposed the Rule, stated that counsel should "resolve in plea negotiations all outstanding charges against the defendant" rather than miring the disposition process in "as many reviews and approvals as there are counties involved." *See* Report of the Committee on Criminal Practice, 98 *N.J.L.J.* 342 (1975); S. Pressler, *Current New Jersey Court Rules,*

---

[3]The Court said:

> Syndicated gambling is an area within which uniformity can be approached. Unlike most crimes, the factual picture is itself quite uniform. A bookmaker is a bookmaker and a runner is a runner. The details of the criminal event are pretty much the same. The demeanor of the defendant on the stand, if he takes it, ordinarily is not critical. The feel of one case is pretty much the feel of most others. The presentence report sums up the crime and the offender.

> Even the circumstances of the individual offenders are more constant than in the case of most other crimes.... The difficulty has been that some judges cannot see beyond the individual they are sentencing.... [However,] the very uniformity of both the offense and the situation of the offenders tends to make disparate treatment unmistakable....

> For these reasons, we decided as a matter of administrative policy to have all sentencing in these matters handled by a single judge in each county.

> [*De Stasio, supra,* 49 *N.J.* at 254–55.]

Comment *R.* 3:25A. The Committee also recognized the problems of disparity through regional and judicial idiosyncracies, citing the need for disposition at one time and place rather than subjecting defendants to "differing attitudes and conclusions" among prosecutors' offices, "delays and duplication of efforts of courts and probation departments and conflicts resulting from varying judicial standards in evaluation of agreements ..." *Ibid.* The Committee sought to avoid "unnecessary delay and expenditure of effort," and stated that although this role might allow some degree of forum shopping, "such opportunities ... are not necessarily contrary to the public interest, for they tend to encourage greater uniformity in plea discussion and case disposition." *Ibid.*

The vigor of the policy to enhance sentencing uniformity is manifested not only in legislation, decisional law, judicial rules, court directives, and past practices; it also is reflected in contemporary practices and prevailing attitudes. Thus, in October 1979, the Court ordered the establishment of a special resentencing panel, composed of three Superior Court judges, "to consider motions filed by persons under sentence of imprisonment on the effective date of the Code of Criminal Justice for sentence review under the Code." 104 *N.J.L.J.* 369 (1979). The purpose of the order was "to further uniformity in sentencing ... with regard to ... all ... persons regardless of the county where they were originally convicted." *Ibid.;*[4] *see State v. Maguire,* 84 *N.J.* 508, 512 n. 2 (1980).

The attitudes within the judicial and legal communities that endorse uniform sentencing have been enduring. This is exem-

---

[4]The administrative directive stated:

> The Supreme Court has directed that, effective immediately, all hearings on motions filed by persons under sentence of imprisonment on the effective date of the Code of Criminal Justice pursuant to *R.* 3:21–10(b)(4) for sentence review under the Code will be conducted before a three-judge panel appointed by the Chief Justice.... It is the aim of this policy to further uniformity in sentencing procedure by having the panel conduct

plified by continuous efforts to achieve greater sentencing uniformity. Thus, during the 1970s the Administrative Office of the Courts, under the direction of the Supreme Court, undertook several initiatives seeking the achievement of uniformity. The AOC instituted a Sentencing Disparity Project, funded through federal grants, which also played a role in the formulation of experience tables and sentencing guidelines used in Essex County for a short period prior to enactment of the Code. *See State v. Whitehead*, 159 *N.J.Super.* 433 (Law Div. 1978), aff'd, 80 *N.J.* 343 (1979). More recently, the Court constituted a Task Force on Reduction of Undue Sentencing Disparity and Improved Sentencing Procedures (Task Force). One of its several projects, with the Criminal Disposition Commission, included documenting the extent of sentencing disparity and enlisting the use of historical materials and statistical analysis in combatting such disparity. *See* Task Force Proposal 4 (1986). The Chief Justice in 1982 appointed a committee under the chairmanship of Judge James Coleman, charged with development of the sentencing-panel concept in order to reduce sentencing disparity. In 1983 this committee issued a report discussing approaches for dealing with sentencing disparity and inconsistency, and offered proposals for reform of sentencing procedures. Coleman Report, *supra*, at 9–16. The Coleman Committee reconvened in 1985 and proposed an ongoing dialogue between sentencing judges and a review panel that would serve research and educational purposes. Task Force Proposal, *supra*, at 5–6. In a similar vein, the Task Force has proposed the development of sentencing information, oversight of attempts to clarify sentencing principles through ongoing judicial discussions, and guidance of judicial education, particularly through preparation of a sentencing manual (which it developed and issued to judges on August 23, 1988). Task Force Propos-

---

hearings with regard to, and resentence where appropriate, all such persons regardless of the county where they were originally convicted.

al, *supra*, at 7–8. Further, educational programs have been presented at the annual Judicial College, and sentencing seminar sessions have been conducted addressing the concerns of disparity. *See* Coleman Report, *supra*, at 6; Task Force Proposal, *supra*, at 6.

We are satisfied that there is an unerring public commitment and strong judicial mandate to maximize uniformity, consistency, and proportionality in criminal sentencing. These are grounded in the letter and spirit of the Code of Criminal Justice and in firm principles of public policy that are both historically and currently found and applied in judicial rules and administrative practices. These principles are seen as well in enduring attitudes evidenced by a continuing institutional commitment to achieve greater sentencing uniformity and parity. These are powerful considerations that impel us to exercise our judicial authority under the State Constitution to accommodate these goals by fashioning sentencing relief in this case.

## V.

The record discloses a kind of sentencing inconsistency and disparity that conflicts with the goals of uniformity and proportionality. The difference between the lengths of the sentences, as such, does not demonstrate either a lack of uniformity or disproportionality. Each of the sentences falls within the tolerances provided by the sentencing guidelines of the Code. However, the huge variation in aggravating and mitigating circumstances found by each judge suggests a lack of uniformity that invites more critical examination. It may be, as pointed out, that this discrepancy in determining and weighing of aggravating and mitigating factors is explainable. *Ante* at 565–566. The question, however, is whether the approach to the determination of aggravating and mitigating factors and resultant sentence disparity is justified.

The facts and information before each of the sentencing judges admittedly differed to some extent; this is not quite the paradigmatic example of non-uniformity where two similar de-

fendants are treated dissimilarly. Nevertheless, the treatment of defendant was disparate for very similar crimes committed within a relatively brief period of time. The differing attitude of each judge toward the defendant and the circumstances of her crimes, not the qualitative difference in the respective sentencing records, appears to have played a major role in this difference. It is this kind of idiosyncratic sentencing difference that *Rule* 3:25A–1 seeks to avoid.

As noted earlier, *Rule* 3:25A–1 has an underlying purpose to advance the goals of sentencing uniformity. *Supra* at 573–574. The Rule currently places the responsibility on the prosecutor to move for consolidation. The defendant and judge hold veto power over such consolidation, but no such power extends to any of the prosecutors involved; the prosecutors have the opportunity to be heard, but no more. See Report of the Committee on Criminal Practice, *supra*, 98 *N.J.L.J.* at 342.

*Rule* 3:25A–1 is hereby modified to enable a defendant to request consolidation of charges pending in multiple counties for purposes of offering pleas and for sentencing. Such an application may be made with respect to all charges pending against a defendant in different counties. An application by a defendant confronted with multiple charges in more than one county should be made, if at all possible, prior to the offer and entry of guilty pleas. On such an application the prosecutors of the respective counties should have the opportunity to be heard.

■ In determining such an application, the court should consider the nature of the underlying offenses, the number of offenses, their similarity or connection with other pending crimes, and the span of time within which the crimes were committed. In determining appropriate venue in connection with consolidation, the court should also consider the number of crimes committed in each of the respective counties, the comparative gravity of the several crimes committed in each county, and the county in which the last or most recent crime was committed. The court should consider also the defendant's

sentencing status. For example, matters relating to the character and condition of the defendant that, if present, may implicate the needs of deterrence, *see, e.g., State v. Jarbath, supra,* 114 *N.J.* at 405–06, would be relevant. The existence of an extensive prior criminal record and a substantial or varied sentencing history, suggesting a diminished concern for the risk of disparity, may also be relevant to the consolidation decision.

■ Ordinarily the judge sitting in the county in which most of the more serious crimes were committed should entertain the application for the consolidation and determination of guilty pleas and sentence. A judge sitting in one county may for good cause consolidate pleas or sentencing proceedings and transfer the consolidated matter to a judge in another county for final disposition.

We do not by this decision define the entire content or delineate the full contours of such an amended consolidation Rule. The configuration of a consolidation Rule should evolve in the light of continued experience and study. *See, e.g., State v. Gregory,* 66 *N.J.* 510 (1975). Such a judicial Rule may be promulgated appropriately through the regular exercise of the Court's rulemaking authority. The standards set forth in this opinion shall suffice, however, to clarify the authority and responsibility of trial courts and to guide their discretion in cases such as this.

■ Here, the circumstances fairly dictate consolidation of sentencing. The crimes were committed during a relatively brief period of time; the offenses were substantially similar and were of equal gravity. Although the crimes occurred in different counties, they were in close geographical proximity. Moreover, the sentencing posture of the defendant militates in favor of consolidation. She was a first-time offender in the sense that prior to this crime spree, she had no criminal record; there appears no reason why the presentation of her background and other relevant information as set forth in a pre-sentence report should be duplicated.

We thus conclude that defendant is entitled to have the opportunity to seek consolidation of these offenses for sentencing purposes. Further, although the crimes committed were equally serious and evenly divided between the counties, as the last crime occurred in Passaic County, any remand to accommodate such a sentencing procedure should be directed to the Superior Court, Law Division, Passaic County.

## VI.

The matter is remanded to the Superior Court, Law Division, Passaic County. That court, on a motion for consolidation and resentencing by defendant, is directed to vacate the sentences and consolidate the sentencing on all crimes to which defendant has entered pleas of guilty both in Bergen County and Passaic County. We rule further that if defendant does not move for consolidation and resentencing, the judgments of the courts below upholding the sentences are affirmed.

Remanded.

*For remandment*—6

HANDLER, CLIFFORD, POLLOCK, O'HERN, GARIBALDI and STEIN—6.

WILENTZ, C.J., did not participate.

*Opposed*—None.