**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2328-19

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

CLARENCE N. SCONIERS,
a/k/a SMOKIE SCONIER, and
CLARNECE SCONIERS,

     Defendant-Appellant.

_____

Argued October 4, 2021 – Decided November 1, 2021

Before Judges Messano and Enright.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Indictment No. 19-01-0105.

Margaret McLane, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Margaret McLane, of counsel and on the briefs).

Nicole Handy, Assistant Prosecutor, argued the cause for respondent (Scott A. Coffina, Burlington County

Prosecutor, attorney; Nicole Handy, of counsel and on the brief).

PER CURIAM

Defendant Clarence N. Sconiers appeals from his November 13, 2019 conviction and January 17, 2020 sentence. We affirm.

In January 2019, a Burlington County Grand Jury indicted defendant, charging him with third-degree theft by deception, N.J.S.A. 2C:20-4 (count one); third-degree receiving stolen property, N.J.S.A. 2C:20-7(a) (count two); and third-degree forgery of motor vehicle title, N.J.S.A. 2C:21-4.8(b)(3) (count three). A jury convicted him on all counts. The trial judge sentenced defendant to a five-year prison term, subject to a two-and-a-half-year period of parole ineligibility on count one, and a concurrent seven-year term, subject to a three-year period of parole ineligibility on count two, based on defendant's eligibility for an extended term as a persistent offender under N.J.S.A. 2C:44-3(a). The judge merged count three with count one and ordered defendant to pay the applicable fines and penalties, as well as $15,000 in restitution to his victim, Danny Sanchez.

In March 2018, Danny was interested in purchasing an SUV with low mileage, so he enlisted the help of his brother, Christian.[1]  Christian, a car mechanic, searched on Craigslist and found a post showing a 2013 Acura MDX was for sale at a price of $16,500.  The car was located near Mount Holly.

Danny contacted the seller, who waited approximately two weeks to respond.  When the seller answered, he gave Danny his phone number and told him his name was "Travis Allen Hunter."  Hunter texted Danny the Acura MDX's identification number (VIN) so Danny could conduct additional research on the vehicle.  After Danny searched the VIN on Carfax.com and found the mileage listed on the website matched what was set forth on Craigslist, he decided to buy the car.

Two precipitating events eventually led the police to conclude defendant posed as "Hunter" to sell the Acura posted on Craigslist.  First, at approximately 2:30 a.m. on April 19, 2018, the Burlington City Police Department stopped a black minivan and issued two motor vehicle summonses to the driver.  Defendant was the driver of the minivan, and he told the police he lived in

---

[1]  Because the victim and his brother share the same surname, we refer to them by their first names for the convenience of the reader.  We mean no disrespect.

A-2328-19

Newark. The stop occurred roughly fifteen minutes from Willingboro and about twenty-five minutes from Mount Laurel.

Second, on the evening of April 20, 2018, a woman drove her 2013 Acura MDX to her condominium in Mount Laurel. After parking her car in its designated space, she locked it and took her car keys with her. The next morning, she noticed her car was missing. She promptly contacted the Mount Laurel Police Department, and the responding officers confirmed her car was not repossessed or towed by the condominium association. They also noted what appeared to be markings from a tow truck where the Acura had been parked.

On April 21, 2018, the Sanchez brothers, their father, and a friend traveled from New York to Willingboro to meet with Hunter to buy the Acura. The group spotted the car after arriving at an apartment complex chosen by Hunter. Once they confirmed the car's VIN number matched the VIN number listed on the Carfax report, Danny called Hunter.

Shortly thereafter, a gray sedan pulled up to the group and a man approached Danny. Christian asked the man if he was Hunter and the man said "yes." Christian described Hunter as a "very light-skinned African-American

4

male," stocky, about 5'8" to 5'11," with a "round head" and facial hair, who wore gold-rimmed aviator sunglasses.

Christian test drove the Acura while Hunter sat in the front passenger seat. Danny and Christian later recalled Hunter was sweating during the ride, and when asked if he was okay, Hunter stated he wasn't feeling well.

Following the test drive, Christian offered to buy the Acura for a discounted price of $15,000, payable in cash. Hunter immediately accepted the offer and took the money. He also gave Danny two sets of keys, but left the license plates on the Acura, telling the Sanchez brothers to mail the plates back to him once they returned home. Hunter also turned over title to the vehicle. The title listed the seller's name as "Travis A. Hunter," and reflected that Hunter lived in Willingboro.[2] The entire transaction lasted approximately thirty minutes.

After returning home, Christian was unable to contact Hunter by phone or text to discuss mailing the old license plates for the Acura back to Hunter. Christian became suspicious and the next day, he looked up the vehicle's VIN number on the website of the National Insurance Crime Bureau. The website

---

[2] At trial, a representative from the State's Motor Vehicle Commission testified there were numerous errors reflected in the car title (e.g., the title issue date) which led her to conclude the document was counterfeit.

suggested the Acura might be stolen. Christian called the Crime Bureau to obtain additional information, and on April 23, 2018, he was informed the car was reported stolen two days earlier. Christian again tried unsuccessfully to reach Hunter and then called the Willingboro and Mount Laurel Police Departments to advise them about the stolen vehicle. Christian later turned over the Acura to the police so it could be returned to its rightful owner.

Detective Sean Bristow of the Mount Laurel Police Department became the lead investigator on the case. He obtained surveillance footage from the apartment complex where the Sanchez brothers said they met Hunter to buy the Acura. The footage showed that at approximately 7:00 a.m. on April 21, 2018, someone drove an Acura MDX into the complex, and it was followed by the same minivan that defendant was driving when he was stopped by the police two days earlier. The video showed the minivan driver exiting his car and directing the person in the Acura to back into a certain parking spot. At approximately 7:27 a.m., the minivan left the complex, but the Acura remained in its spot. The footage also showed the illegal sale of the Acura to the Sanchez brothers on April 21.

When Detective Bristow obtained defendant's cellphone records, they reflected defendant lived in Newark. The records also revealed that from March

26 to April 18, 2018, defendant's phone was in or around Newark, but between April 18 and 19, his phone was in the area of Westampton Township in Burlington County. Further, the records reflected that although defendant's phone was in the Newark area on April 20, it was back near Westampton Township on April 21, the day the Acura was stolen. The records also showed several calls were made between 3:09 and 3:15 p.m. on April 21, and that defendant's cell phone connected to a cell tower located approximately 1.25 miles away from where the Sanchez brothers purchased the stolen Acura. The phone call at 3:15 p.m. lasted for approximately twenty-five minutes.

At trial, Detective Bristow testified that when the 3:15 p.m. call occurred, the surveillance footage showed defendant was "milling around the corner by the building" and that when he interacted with the Sanchez brothers, the call continued. Detective Bristow also testified he was unable to locate any individual by the name of "Travis Allen Hunter" in the State of New Jersey or surrounding areas.

Prior to trial, Christian participated in three photo arrays to assist in the investigation. The first two arrays were administered by the Willingboro Police Department on April 26, 2018. During the first array, the police showed Christian six photographs. He stated none of the photos looked like the man

who sold Danny the Acura. During the second array, Christian identified a photo of a man he believed to be the culprit. Christian stated he was eighty-percent confident in his identification. The photo identified by Christian was not of defendant. In fact, neither of the first two arrays included a photo of defendant.

In May 2018, the Mount Laurel Police Department administered a third array, which included six photos. Christian selected defendant's photo and told the police he was eighty-five percent certain the person in the chosen photo was the person who sold the Acura to his brother. Danny did not participate in any pre-trial photo arrays.

At trial, Christian made an in-court identification of defendant, stating he was "a thousand percent" certain defendant was the same man who sold Danny the Acura. Danny also identified defendant at trial as the person who sold him the Acura, testifying he was "[l]ike a hundred percent sure" defendant was "Hunter."

Defendant called his girlfriend's father to testify at trial. This witness testified that his daughter, as well as defendant and the couple's child, were at his Willingboro home on April 21, 2018 for a family gathering. He also testified defendant remained at the gathering from about 11:30 a.m. to 3:00 or 3:30 p.m.

and that defendant subsequently asked him to write a letter confirming defendant's presence in his home that day.

When the trial concluded, the jury found defendant guilty on all charges, triggering the instant appeal. Defendant now raises the following arguments for our consideration:

POINT I

THE IMPROPER ADMISSION OF THE LEAD DETECTIVE'S LAY OPINION IDENTIFYING THE DEFENDANT FROM THE SURVEILLANCE VIDEOS WAS PLAIN ERROR, REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS. (Not Raised Below).

POINT II

THE COURT ERRED IN PERMITTING THE VICTIMS TO MAKE IN-COURT IDENTIFICATIONS OF DEFENDANT BECAUSE THEY WERE HIGHLY SUGGESTIVE AND UNRELIABLE. (Not Raised Below).

POINT III

EVEN IF EITHER OF THE COMPLAINED-OF ERRORS WOULD BE INSUFFICIENT TO WARRANT REVERSAL, THE CUMULATIVE EFFECT OF THOSE ERRORS WAS TO DENY DEFENDANT DUE PROCESS AND A FAIR TRIAL. (Not Raised Below).

THE SENTENCE, WITH ITS DISCRETIONARY EXTENDED TERM AND DISCRETIONARY PAROLE DISQUALIFIER, IS EXCESSIVE.

We are not persuaded.

Because defendant did not argue his initial three points before the trial court, we review these contentions for plain error. R. 2:10-2. Thus, we may disregard these purported errors unless they are "of such a nature as to have been clearly capable of producing an unjust result[.]" Ibid. "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" State v. Ross, 229 N.J. 389, 407 (2017) (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

Regarding Point I, we note that opinion testimony of a lay witness is governed by N.J.R.E. 701, which states, "[i]f a witness is not testifying as an expert, the witness'[s] testimony in the form of opinions or inferences may be admitted if it:  (a) is rationally based on the witness'[s] perception; and (b) will assist in understanding the witness'[s] testimony or determining a fact in issue." "The first prong of N.J.R.E. 701 requires the witness's opinion testimony to be based on the witness's 'perception,' which rests on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." State v.

Singh, 245 N.J. 1, 14 (2021) (quoting State v. McLean, 205 N.J. 438, 457 (2011)).  Therefore, the witness's knowledge may not be acquired through "hearsay statements of others."  State v. Sanchez, 247 N.J. 450, 469 (2021) (citing N.J.R.E. 701).  Under the Rule's second prong, the lay witness's testimony must "assist the trier of fact either by helping to explain the witness's testimony or by shedding light on the determination of a disputed factual issue." Singh, 245 N.J. at 15 (quoting McLean, 205 N.J. at 458).

It is well established that a police officer may provide testimony describing "what the officer did and saw," because "[t]estimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge."  Ibid. (quoting McLean, 205 N.J. at 460).  Here, defendant argues Detective Bristow's testimony violated N.J.R.E. 701 because the detective was not an eyewitness to the transaction depicted in the surveillance footage.  Defendant also contends that because the detective lacked personal knowledge, his opinion about the footage did not assist the jury, and jurors were capable of evaluating the video on their own.  Defendant further argues Detective Bristow's testimony was harmful because the identification of the person on the footage was a critical

issue for the jury, yet the detective repeatedly referred to the person depicted in the video as "the defendant" rather than "the suspect."

In Singh, the Court held that although N.J.R.E. 701 was violated when the detective in that case identified the individual in a surveillance video as "the defendant" versus "the suspect," the violation was not plain error. Id. at 18. The Court noted the detective referred to "the defendant" only twice while narrating the footage and, otherwise, referred to defendant as "the suspect," "a male," "a person," or "the individual." Ibid. The Court found this error to be "harmless given the fleeting nature of the comment and . . . that the detective referenced defendant as 'the suspect' for the majority of his testimony." Id. at 17. Moreover, the Court concluded the evidence against defendant "was significant enough" so that the detective's "passing references to defendant as 'the defendant' [did] not amount to plain error."[3] Id. at 18.

This case is distinguishable from Singh. Here, Detective Bristow referred to defendant as "the defendant" eleven times during his narration of the surveillance video. Detective Bristow even went so far as to state defendant

___

[3] The Court instructed however, that in future criminal cases, "a reference to 'defendant,' which can be interpreted to imply a defendant's guilt − even when . . . used fleetingly and appear[ed] to have resulted from a slip of the tongue − should be avoided in favor of neutral, purely descriptive terminology such as 'the suspect' or 'a person.'" Singh, 245 N.J. at 18.

committed the crime reflected in the footage, testifying "[a]nd here[,] you'll see the defendant providing the Sanchezes the bag containing the license plate and the Acura records." Although the State concedes this portion of the detective's testimony was improper, it argues that based on its overwhelming proofs against defendant, the detective's error was not so prejudicial that it caused the jury to reach an unjust result. We agree.

The record reflects the jury did not hear Detective Bristow's testimony until after Danny and Christian testified. While on the witness stand, each brother identified defendant as the person seen on the video. Moreover, unlike the victim in Singh, here, the Sanchez brothers spent approximately twenty to thirty minutes with defendant in broad daylight during the incident, thereby enhancing the reliability of their identifications. See id. at 5-6. We also note Detective Bristow provided testimony the Sanchez brothers could not. For example, he testified about how he acquired the surveillance footage, and he provided detailed information regarding defendant's cellphone. Additionally, defense counsel had the opportunity to vigorously cross-examine Detective Bristow regarding his description of the man pictured in the footage, as evidenced by the following colloquy:

Q: You wouldn't have known who he is, right?

A: [T]hose [motor vehicle summonses] are the way I identified Mr. Sconiers as a possible suspect. And then the other evidence I gathered also led me to Mr. Sconiers being the subject that conducted the sale of the Acura.

Q: Who you believe is the subject, right?

A: At this point my evidence has determined it is Mr. Sconiers.

Q: You weren't there when it happened, were you?

A: I was not.

Q: You were not a witness to that sale, were you?

A: I was not.

Q: You [were] not a participant to that sale, were you?

A: No, I was not.

Q: You did not talk to the person who presented that vehicle for sale, did you?

A: No.

The record also reflects that during the detective's cross-examination, the judge interjected and stated, "[w]ell, . . . I imagine that would have been a question for Mr. Sanchez as opposed to the detective who's not trying to identify anybody." (Emphasis added). Given this comment by the judge, his charge to the jury about identification testimony, and mindful that: the detective's

testimony followed the strong positive identifications made by the Sanchez brothers; defendant's minivan matched the one seen in the surveillance footage; and cellphone records reflected defendant made several calls that connected him to a cell tower near where the illegal transaction occurred, we cannot conclude it was plain error to admit the detective's challenged testimony.

Regarding Point II, defendant argues the judge erred in permitting the Sanchez brothers to make in-court identifications because the identifications were highly suggestive and unreliable. He also argues the standards articulated in State v. Henderson, 208 N.J. 208 (2011), which are used for evaluating out-of-court identifications, should apply to in-court identifications.[4] Further, he asserts "in-court identifications that take place without a prior out-of-court identification, or with an equivocal out-of-court identification, should be

_____

[4] In Henderson, the Supreme Court revised the framework to be used when evaluating the admissibly of out-of-court identifications and implemented a four-pronged test. 208 N.J. at 288-90. The Court instructed that "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Id. at 288. Second, if a defendant meets his or her burden, "[t]he State must then offer proof to show that the proffered eyewitness identification is reliable[,] accounting for system and estimator variables." Id. at 289. Third, a defendant must "prove a very substantial likelihood of irreparable misidentification." Ibid. Lastly, "if . . . a court finds from the totality of the circumstances that [a] defendant has demonstrated a very substantial likelihood of irreparable misidentification, the court should suppress the identification evidence." Ibid.

excluded as unduly prejudicial."  We find these arguments unavailing. Moreover, we perceive no basis to extend the principles outlined in Henderson to in-court identifications, and concluded as much in State v. Guerino, 464 N.J. Super. 589, 606-07 (App. Div. 2020).

"Reliability is the linchpin in determining the admissibility of identification testimony."  State v. Micelli, 215 N.J. 284, 292 (2013) (quoting Manson v. Brathwaite, 432 U.S. 98, 114 (1977)).  The Supreme Court adopted the following factors for a judge to consider when assessing the reliability of an identification:

> the opportunity of the witness to view the criminal at the time of the crime, the witness'[s] degree of attention, the accuracy of [the witness's] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.
>
> [Ibid. (quoting State v. Herrera, 187 N.J. 493, 503 (2006)).]

As we noted in Guerino, "the threshold for suppression of [an] in-court identification is high."  464 N.J. Super. at 622 (citing Henderson, 208 N.J. at 303).  In most instances, "identification evidence will likely be presented to the jury" and "[i]t will remain the jury's task to determine how reliable that evidence is, with the benefit of cross-examination and appropriate jury instructions."

16

State v. Chen, 208 N.J. 307, 328 (2011) (citation omitted); see also State v. Lazo, 209 N.J. 9, 24 (2012) ("In an identification case, it is for the jury to decide whether an eyewitness credibly identified the defendant.  Guided by appropriate instructions from the trial judge, juries determine how much weight to give an eyewitness'[s] account." (citing State v. Farrow, 61 N.J. 434, 451 (1972), cert. denied, 410 U.S. 937 (1973))).  "In rare cases . . . highly suggestive procedures that so taint the reliability of a witness'[s] identification testimony will bar that evidence altogether."  Ibid.

In Guerino, we declined to extend the Henderson principles to in-court identifications, cognizant that a judge's "decision to prohibit an in-court identification is made on a case-by-case basis."  464 N.J. Super. at 606.  See also State v. Madison, 109 N.J. 223, 242 (1988) (holding an in-court identification is not admissible if a "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (quoting Simmons v. United States, 390 U.S. 377, 384 (1968) (emphasis omitted))).

Here, defendant did not object at trial to a single photo array from Christian's out-of-court identifications.  Also, he did not request a pretrial evidentiary hearing, as permitted in Henderson, nor did he present any evidence

17

that the photo arrays presented to Christian were impermissibly suggestive. Moreover, following Christian's direct testimony, defense counsel thoroughly cross-examined him about the three photo arrays, noting Christian's mistaken identification in the second photo array; counsel also questioned Christian about his in-court identification. Given these facts, and because defendant does not demonstrate how Christian's in-court identification was tainted by any suggestiveness outside the courtroom, defendant has not established the judge erred in allowing Christian to identify defendant at trial.

Turning to Danny's in-court identification, we are persuaded the analyses set forth in Henderson and Madison are inapplicable because Danny did not make any out-of-court identifications. Therefore, N.J.R.E. 403 governs our analysis. That Rule states "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of: (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403.

Here, Danny made an in-court identification of defendant with "one-hundred percent" certainty, after which defendant's attorney cross-examined him about the identification. Danny testified that he did not discuss defendant's identity with Christian or his father, and that he did not view the surveillance

18

video prior to trial. As we have noted, Danny spent a significant amount of time with defendant during daylight hours when he and defendant first met in person to discuss the sale of the Acura. Thus, we cannot conclude the probative value of Danny's in-court identification was outweighed by any prejudice to defendant.

The judge's jury charge about identification testimony also militates against concluding the in-court identifications should have been barred. Here, the judge instructed jurors to assess the reliability of identification testimony by considering factors like the prior description of the perpetrator, the time elapsed between the incident and the statement, and cross-racial effects. The judge further directed jurors to

> consider the observations and perceptions on which the identification was based, the witness's ability to make those observations and perceive events, and the circumstances under which the identification was made. Although nothing may appear more convincing than a witness's categorical identification of a perpetrator, you must critically analyze such testimony. Such identifications, even if made in good faith, may be mistaken. Therefore, . . . be advised that a witness's level of confidence standing alone may not be an indication of the reliability of the identification.

Under these circumstances, we cannot conclude the judge erred in admitting the in-court identifications of the Sanchez brothers.

19

We need not address Point III at length. In short, defendant contends that even if the detective's improper testimony or the Sanchez brothers' in-court identifications do not independently warrant reversal of defendant's convictions, the prejudice flowing from these alleged cumulative errors denied defendant due process and a fair trial. Again, we disagree.

Appellate courts may reverse a defendant's conviction "where any one of several errors assigned would not in itself be sufficient to warrant a reversal, yet . . . all of them taken together justify the conclusion that defendant was not accorded a fair trial." State v. Terrell, 452 N.J. Super. 226, 308 (App. Div. 2016) (quoting State v. Orecchio, 16 N.J. 125, 134 (1954)). As we were not persuaded by either of defendant's plain error arguments in Points I and II, we cannot conclude his conviction resulted from cumulative error.

Lastly, we address defendant's sentencing arguments under Point IV. He contends his sentence is excessive so that even if his conviction is upheld, we should remand this matter for resentencing because the judge: (1) failed to make the requisite findings before sentencing him to a discretionary period of parole ineligibility; (2) engaged in impermissible double counting before imposing an extended term sentence; (3) erred in sentencing him to both an extended term and a period of parole ineligibility; and (4) failed to consider mitigating factor

eleven, N.J.S.A. 2C:44-1(b)(11), (excessive hardship resulting from imprisonment). We are not convinced.

Our "review of a sentencing court's imposition of a sentence is guided by an abuse of discretion standard." State v. Jones, 232 N.J. 308, 318 (2018). We apply a deferential standard when reviewing sentencing determinations. State v. Fuentes, 217 N.J. 57, 70 (2014). Such review requires us to affirm the sentence unless: (1) the sentencing guidelines enacted by the Legislature were violated; (2) there was no competent and credible evidence in the record to support the imposed sentence; or (3) the application of the facts to the law constitutes such a clear error of judgment that it "shock[s] the judicial conscience." Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)). We may remand a matter for resentencing if the trial court failed to provide the required "qualitative analysis of the relevant sentencing factors on the record." Ibid. (citing State v. Kruse, 105 N.J. 354, 363 (1987)). But sentencing "[j]udges who exercise discretion and comply with the principles of sentencing remain free from the fear of 'second guessing.'" State v. Dalziel, 182 N.J. 494, 501 (2005) (citing State v. Megargel, 143 N.J. 484, 494 (1996)).

A sentencing court may impose a parole disqualifier when "clearly convinced that the aggravating factors substantially outweigh the mitigating

factors." N.J.S.A. 2C:43-6(b). The sentencing judge should, but is not required to, use the "clearly convinced" statutory language when balancing the aggravating and mitigating factors. See State v. Logan, 262 N.J. Super. 128, 132, 620 (App. Div. 1993). "A clear explanation 'of the balancing of aggravating and mitigating factors with regard to imposition of sentences and periods of parole ineligibility is particularly important.'" Fuentes, 217 N.J. at 73 (quoting State v. Pillot, 115 N.J. 558, 565-66 (1989)).

Here, the judge found aggravating factors three (risk of reoffense), six, (criminal history), and nine (deterrence), N.J.S.A. 2C:44-1(a)(3)(6) and (9). He also found mitigating factor six, N.J.S.A. 2C:44-1(b)(6) (restitution). The judge explained his findings, noting:

> This is [defendant's] third indictable conviction. And the [c]ourt would, therefore, cite the following aggravating factors: Three, I do find that based on the re-involvement that [defendant] has had while being on some sort of supervision . . . , that this offense occurred while he was on parole. So[,] it does give this [c]ourt some concern that [he] would commit another offense
>
> . . . .
>
> And [aggravating factor] six, . . . one of [defendant's prior] offenses in particular, both are serious, but . . . the later offense [involving conspiracy to commit a robbery,] . . . was particularly serious for

the reasons . . . already indicated[,] citing the aggravating factors that the [c]ourt found in that case.[5]

And, of course, aggravating factor nine, that there is a strong need to deter [defendant] and others from violating the law and that there are very serious repercussions and consequences for doing so.

The judge added:

I wish that [defendant's] daughter's birth . . . would have provided sufficient deterrence for [defendant] to say, you know what, I have a child now, and if I . . . look the wrong way, given my past history that I'd get caught . . . or convicted of it, there's going to be some serious repercussions. And here we are. So[,] I'm certainly very sensitive to parents being involved with their children and . . . how that affects them and a lot of the difficulties and challenges that go along with that. I certainly understand that very, very well.

Regarding mitigating factor six, the judge stated that although he was unsure how restitution would occur if defendant remained in custody, he was still giving "some passing attention" to the factor.

---

[5] Earlier in the sentencing proceeding, the judge noted that when defendant was sentenced in 2012 for conspiracy to commit a robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1, the judge who sentenced defendant in 2012 found aggravating factors one and two, N.J.S.A. 2C:44-1(a)(1) and (2). The judge on the instant matter remarked, "[y]ou usually don't find those aggravating factors in most cases . . . . But I point that out because I think it's important to realize that this particular [conspiracy] offense seemed to involve some serious injury or harm to the victim."

23

Six days after the judge sentenced defendant, he went back on the record and briefly amplified his earlier sentencing decision. Reiterating that he found "aggravating factors three, six and nine as well as mitigating factor six," he "accord[ed] significant and substantial weight to" the aggravating factors and "nominal[]" weight to the lone mitigating factor. He further concluded the "aggravating factors so substantially and qualitatively outweigh the mitigating factor as to warrant . . . the period of parole ineligibility associated with the sentences imposed."[6] Because the judge's aggravating and mitigating factor analysis is supported by competent evidence, and because he found the aggravating factors substantially outweighed the lone mitigating factor, we perceive no reason to conclude the court mistakenly imposed a period of parole ineligibility when fixing defendant's prison terms.

Similarly, we are not convinced the judge erred in imposing an extended sentence or that he "double-counted" defendant's prior convictions. Here, defendant does not dispute he met the criteria of a persistent offender and thus

---

[6] Defendant's attorney did not oppose the State's motion to expand the record to include the January 23, 2020 sentencing proceeding.

was eligible for an extended term under N.J.S.A. 2C:44-3(a).[7]  But he argues

that even if he was found to be a persistent offender, the judge was not required

to impose an extended term sentence of seven years for the third-degree offense

of receiving stolen property.

It is well established that once the statutory eligibility criteria under

N.J.S.A. 2C:44-3(a) are met, the permissible range of sentences "starts at the

minimum of the ordinary-term range and ends at the maximum of the extended-

term range." State v. Pierce, 188 N.J. 155, 169 (2006).  The judge may sentence

the defendant within that range, "subject to reasonableness and the existence of

credible evidence in the record to support the court's finding of aggravating and

---

[7]  A sentencing court is permitted to impose an extended term of imprisonment
if it concludes the defendant is a persistent offender, meaning

> the defendant was convicted of at least two separate
> prior crimes[,] but only if 'the latest' of those crimes
> was committed or the defendant's last release from
> confinement occurred – 'whichever is later' – within ten
> years of the charged crime.
>
> [State v. Clarity, 454 N.J. Super. 603, 606 (App. Div.
> 2018) (quoting N.J.S.A. 2C:44-3(a)).]

Additionally, a defendant must have been at least twenty-one years old when he
committed the crime being sentenced and at least eighteen-years old at the time
of commission of the two prior offenses for which he was convicted.  N.J.S.A.
2C:44-3(a).

mitigating factors and the court's weighing and balancing of those factors found." Ibid. However, the judge should not engage in "double counting" a defendant's prior convictions before imposing an extended term sentence, meaning the judge should not use a defendant's criminal history as both a basis to find defendant is eligible for an extended term, and to enhance his sentence. State v. Vasquez, 374 N.J. Super. 252, 267 (App. Div. 2005). Still, a sentencing judge is not "required to ignore the extent of [a defendant's] criminal history when considering applicable aggravating factors." State v. McDuffie, 450 N.J. Super. 554, 576-77 (App. Div. 2017). Also, "other aspects of the defendant's record, . . . such as a juvenile record, parole or probation records, and overall response to prior attempts at rehabilitation, will be relevant factors in adjusting the base extended term." State v. Dunbar, 108 N.J. 80, 92 (1987).

Here, the judge imposed an extended term sentence in the permissible range. In doing so, he properly recognized defendant was a persistent offender, yet the judge did not exclusively rely on defendant's criminal history to impose the extended term. Instead, the judge also considered defendant's risk of reoffense and the need to deter his behavior. Additionally, the judge noted the seriousness of defendant's prior offenses and that defendant committed the instant offenses while on parole supervision. Further, the judge observed this

was "the type of case that required some sophistication" and that "[t]here were other people involved" in "what could be considered an enterprise."

As discussed, we do not second-guess the decision of a sentencing court so long as it adheres to the sentencing guidelines, is supported by competent and credible evidence in the record, and defendant's sentence does not "shock the judicial conscience." Fuentes, 217 N.J. at 70 (quoting Roth, 95 N.J. at 364-65). Governed by these principles, we conclude defendant's extended term sentence fell in the proper range and was reasonable in light of the judge's analysis of the aggravating and mitigating factors. Further, the sentence does not "shock the judicial conscience." Ibid. (quoting Roth, 95 N.J. at 364-65). Moreover, the record does not support defendant's contention that the judge engaged in impermissible double counting.

Finally, although defendant contends the judge failed to consider mitigating factor eleven, this argument is belied by the record. Indeed, the judge specifically acknowledged defendant "does have a young child for whom he has responsibility," but the judge was not convinced that sentencing defendant to a prison term would present "an unnecessary hardship." We add that the record is devoid of evidence to support defendant's claim that his imprisonment would result in an excessive hardship to him or his dependents.

27

To the extent we have not addressed defendant's remaining arguments, we are satisfied they lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION