269 N.J. Super. 246 (1993)
635 A.2d 512
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANTHONY CATANOSO, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued March 24, 1993.
Decided July 29, 1993.
*248 Before Judges KING, BRODY and LANDAU.
Laura M. Le Winn argued the cause for appellant (Richard S. Lehrich, on the brief).
Robin Parker, Deputy Attorney General, argued the cause for respondent (Robert J. Del Tufo, Attorney General of New Jersey, attorney; Mr. Parker, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
Defendant Anthony Catanoso, a Cape May County freeholder, was convicted of conspiracy, official misconduct and bribery in connection with his solicitation and receipt of bribes. The bribes were solicited from contractors desirous of obtaining work on a county sewer installation project which began in Cape May County in the early 1970s. He received a three-year prison term.
On this appeal from the conviction and sentence, defendant raises eleven issues. They are: (1) the indictment should have been dismissed on the ground of double jeopardy since he was previously acquitted of similar charges also resulting from his alleged receipt of bribes related to the county sewer project; (2) the trial judge erred in denying his motion for acquittal on counts two and three; (3) the trial judge erred in his instructions to the jury; (4) the admission of "bad character" evidence adduced by the State in rebuttal to defendant's good character evidence was improper; (5) prosecutorial misconduct; (6) Evid.R. 55 was violated; (7) the admission of certain diaries of a witness for the State, joined with the lack of a limiting instruction was error; (8) the State's decision to prosecute defendant was made in "bad faith"; *249 (9) expert evidence regarding the result of a polygraph examination administered to a witness for the State was improperly excluded; (10) the cumulative errors warrant reversal; and (11) the sentences on the three counts should have merged. We conclude that the appeal, except for the merger claim, is without merit and we affirm.

I
The principal claim on this appeal is double jeopardy because of acquittal in a prior trial. On September 10, 1986 defendant was charged, in State Grand Jury Indictment SGJ-168-86-9, with conspiracy, N.J.S.A. 2C:5-2 (count one); official misconduct, N.J.S.A. 2C:30-2 (count two); bribery, N.J.S.A. 2C:27-2 (count three); soliciting and accepting gifts to public servants, N.J.S.A. 2C:27-6 (count four); and theft by deception, N.J.S.A. 2C:20-4 (count five).
Most pertinent to the double jeopardy claim, defendant was charged, about eight months later, on May 19, 1987, in a second State Grand Jury Indictment SGJ-182-87-3, with conspiracy, N.J.S.A. 2C:5-2 (count one); soliciting and accepting gifts as a public servant, N.J.S.A. 2C:27-6 (count two); and perjury, N.J.S.A. 2C:28-1 (count four). Defendant first was tried and found not guilty on all counts of this second indictment. This first trial was conducted from January 26 to February 10, 1988 in Cape May County. Trial on the earlier indictment, which is the subject of this appeal, was held in March 1990 in Cumberland County. Both cases were prosecuted by the Division of Criminal Justice of the Attorney General's office.
On March 6, 1990, just before the second trial, defendant renewed his motion for dismissal of all charges on the ground of double jeopardy. A similar motion previously had been denied by Judge Serata on June 24, 1988. Defendant's renewed motion was denied by Judge Serata.
At the conclusion of the State's case in the twelve-day trial conducted in March 1990, of the charges under the first indictment *250 defendant moved to dismiss all charges pursuant to R. 3:18 as unsupported by the evidence. Judge Serata granted the motion with respect to counts four (soliciting and accepting gifts) and five (theft) but denied the balance of the motion. After the prosecutor's summation, defendant moved for a mistrial due to prosecutorial misconduct. That motion was denied. On March 23, 1990, the jury found defendant guilty on the three remaining counts: conspiracy, bribery and official misconduct. Defendant's motion for a new trial was denied.
Judge Serata first reduced the grade of the offenses for which defendant was found guilty and then sentenced him on count one to a three-year prison term and required him to pay $50,000 in restitution. The same sentence was imposed on counts two and three, and these sentences were imposed concurrently to count one. Bail was posted at $50,000 pending this appeal.

II
The "overarching" conspiracy alleged by the State involved public works projects in Cape May County. This is the factual picture presented by the State at the trial resulting in defendant's conviction. In the early 1970s, Cape May County began a project to provide regionalized sewer services within the county (the CMC project). The CMC project involved upwards of $200,000,000 overall and contemplated work over several years. During the early years of the project, and at all times relevant to this matter, defendant Catanoso was the Mayor of North Wildwood, Cape May County, and served on the County's Board of Chosen Freeholders.
In order to pursue the sewer project, the Cape May County Municipal Utilities Authority was established (the MUA). John Vinci, a key witness for the State in this matter, was appointed to the MUA in 1972 and became chairman in 1977. The CMC project involved three major phases: facility planning, facility design, and facility construction. The facilities necessary for the CMC project included sewage treatment plants, sewer lines, pumping stations, force mains, and ocean outfalls. The MUA *251 decided to establish several regions in the County which would function semi-autonomously and would have their own treatment plants. One of these regions was the Ocean City region, the one most relevant to this prosecution.
There were four proposed elements to the Ocean City aspect of the CMC project: a treatment facility, a pumping station, force mains, and ocean outfalls. Only the first two of these elements are germane to the issues on appeal. The MUA originally intended that the site preparation and construction work for the treatment facility would be publicly bid as one contract, after which a separate contract for construction of the pumping station would be bid.
In the late 1960s, Frank Pandullo, a key witness for the State, was president of the engineering firm Pandullo, Chrisbacher and Associates. This firm was the predecessor to Pandullo Quirk Associates (PQA). This firm, which specialized in civil engineering and the design and construction of waste water treatment systems, became interested in obtaining work in Cape May County in the early 1970s. Pandullo learned that defendant Catanoso and Phillip Matalucci, a Republican leader and County Treasurer, were the key politicians in Cape May County. Through an acquaintance, Anthony Palladino, Pandullo made his interest in working on the CMC project known to these two individuals. Palladino arranged a meeting between himself, defendant, Matalucci and Pandullo in June 1972. During this meeting Pandullo sought the support of the two politicians for his firm's efforts to obtain work on the CMC project. During this meeting, Palladino informed Pandullo that it was customary that a 10% "kickback" be paid for any such political support. Defendant and Matalucci clearly heard this comment according to Pandullo. Pandullo said he could not afford such a payoff. He claimed that he previously had made similar payoffs to obtain work in Cumberland County. Pandullo was later advised that PQA had the support of defendant and Matalucci but would have to do "the best it could" to make payoffs to them. John Vinci, who would become the MUA's *252 second chairman in 1977, learned sometime in 1976 of Pandullo's alleged "obligation" to pay defendant and Matalucci money in return for their support.
In December 1972, PQA interviewed for the position of consulting engineer for the project in Ocean City. The consulting engineer would be responsible for performing studies, preparing the contract documents relating to the project, and working with the State and federal governments to obtain the necessary funding. During this interview, Pandullo first met Vinci.
In March 1973, PQA was awarded the consulting engineer contract for the project. Shortly thereafter, Pandullo met with defendant, Matalucci and Palladino at a golf course. When defendant and Pandullo were alone, Pandullo gave defendant $10,000 in cash, in return for defendant's support of PQA's bid to become consulting engineer on the project. Pandullo made further payments to defendant during 1974, totalling an additional $8,000.
In another payoff scheme, also in 1974, Vinci asked Pandullo to pay him $150,000 for Vinci's continuing support of PQA's involvement in the project. Since Pandullo was afraid of what would happen if he did not pay the money, he agreed. However, Pandullo did not pay Vinci entirely in cash; rather, he paid Vinci in certain services, and through the purchase of items such as Vinci's home in Burleigh, Cape May County, at an inflated price. Pandullo also paid Vinci $2,000 per month in cash for twenty-four months, ending in 1982 when Vinci was not reappointed to the MUA.
Vinci also testified that, in 1976, he had a discussion with defendant during which he was informed that certain people required payoffs. Thus, for example, a landfill site owned by Foundations and Structures, Inc. (F & S) should be chosen for the location of the project's treatment plant. Vinci accepted these comments as instructions on how to make the payoffs.
As mentioned, the MUA originally intended that one contract would cover the site preparation and construction work related to *253 the treatment facility in Ocean City. In 1977 or 1978, this contract was split into two separate contracts: one for the site preparation work, and one for construction of the plant. Edward Altman, a PQA employee serving as project manager at that time, testified that this was more cost effective and done because the MUA wanted smaller firms to bid on the site preparation contract (smaller firms could not handle both the site preparation and construction of the treatment facility), and because it hoped that excavation work involved in the site preparation could begin in the winter. This was to minimize the negative impact on Ocean City tourism which might result from odors caused by excavation of the F & S landfill site in the summer.
In contrast to Altman, Vinci testified that he received a call from defendant, who said that use of a single contract would preclude defendant's favored firm, F & S, from bidding on the site preparation work, since F & S could not handle the construction aspects of the job. As a result, Vinci testified, the decision was made to split the two aspects of the treatment facility's construction into two separate contracts.
Site preparation bids were opened in the fall of 1978, and the low bidder was Carl Widell & Son (Widell), a firm which specialized in waste plant and heavy construction. F & S was the next lowest bidder. A commotion ensued in the room after the bids were announced. Vinci received a call from defendant immediately after the bids were opened, instructing Vinci to delay the award of the bid to Widell so that action could be taken to insure that F & S was awarded the site preparation contract. Altman called Pandullo, and told him that the "wrong people" got the site preparation job, since F & S was expected to obtain that work. Finally, Nelson Widell, Vice President of Widell and the son of the firm's owner, Wilbert Widell, was also told that his firm was not supposed to get the site preparation job. However, there was no basis for the rejection of Widell's low bid.
Nelson Widell testified that he was told, after several delays in actually receiving the site preparation contract following Widell's *254 low bid, that this was a political matter, and that it would be helpful if Widell used F & S as a subcontractor. Hence, a Widell employee, Warren Mason, set up a meeting in October 1978 between Nelson Widell, his father, Wilbert Widell, and two F & S representatives, Ted DeSantis and Bill Monaghan. At this meeting, the Widells were told that if they did not use F & S, the Widell firm would not get the site preparation job. Since F & S was apparently in a position to control award of the job, the Widells acceded and reached an agreement to use F & S as a subcontractor. Under this arrangement, a site controlled by F & S would be used to dump displaced material from the excavated landfill, and material from F & S would be used to re-fill a part of the excavated site. When the Widells stopped at PQA's office after meeting with F & S, they were informed by Altman that the site preparation contract could now be awarded. That night after the meeting, Wilbert Widell suffered a stroke. Clyde Lattimer was then brought in to take over Widell's operation.
Towards the end of 1978, after Widell had been formally awarded this site preparation contract and had begun work on it, the firm began to run "over estimate" on the quantity of sand which would be needed to refill the landfill in preparation for construction of the treatment plant. This, in turn, led to a cost overrun of about $250,000. In order to avoid having to absorb this sum for cost overrun, Widell wanted to submit a change order to the MUA through PQA. If not, Widell would have to absorb the additional cost itself.
In December 1978, Nelson Widell (Nelson) and Lattimer were told by Warren Mason, their employee, that he met with Monaghan and DeSantis of F & S regarding the required change order. Mason told them that in order to obtain the change order, $10,000 would be needed by Monaghan to pay "the boys," whom Mason said were political people in the county. F & S, Gaskill Construction Co., another subcontractor Widell was using, and Widell would each pay one-third of the $10,000. After deciding to pay the money, a bonus salary check was written to Mason in January *255 1979, and Mason was told to do what was necessary. Nelson and Lattimer did not want to know the details. The change order was formally submitted in February 1979.
Daniel Kelly, a PQA employee working on the CMC project, was responsible for overseeing the change order submitted by Widell. Although he was against issuing the change order, he wrote a letter to the MUA explaining why the change order was necessary. He would not have written that letter unless instructed to do so by Pandullo.
However, the change order still was not approved, and in March or April 1979, Mason informed Lattimer that Monaghan said another $10,000 was needed to obtain the change order. Nelson and Lattimer decided to make the payment themselves, since Lattimer was afraid Mason was "shaking down" the firm for his own profit. They obtained the money in late March or early April 1979, drove to Monaghan's house, and Nelson handed the cash to Monaghan personally. Monaghan told Nelson the money would get to the "right people." Within two weeks, the change order was executed.
Before the change order was approved, a meeting was conducted in January 1979 at Pandullo's PQA office to discuss it. Before the meeting began, Pandullo testified that he received a telephone call from Vinci. Pandullo testified that Vinci was aware, by this time, of his continuing obligation to pay "the boys" off for their cooperation, and that Pandullo had been unable to meet that obligation during 1977 and 1978. Vinci told Pandullo to ask Lattimer what it would be worth to receive ongoing cooperation from the current MUA chairman, Vinci, particularly since Widell was planning on bidding on other aspects of the project. Pandullo felt that, due to his obligation to pay Vinci $150,000, and due to his continuing obligation to pay defendant, he should follow Vinci's instructions. Pandullo discussed this matter with Lattimer, who told him it would be worth $50,000 to Widell to insure Vinci's continuing cooperation.
*256 Lattimer's testimony in this regard was somewhat different. He testified that after Pandullo received a call from Vinci, he and Pandullo met privately after the meeting had ended. Pandullo told him that he was carrying a message from "the boys"; specifically, if Widell wanted the construction contract, the firm would have to pay "the boys" $100,000. Lattimer rejected this proposal, even though the firm wanted the work, believing that if the firm was the low bidder on the contract, it would get the construction job anyway. Pandullo did not identify who "the boys" were. Nelson similarly testified that after the meeting concluded, Lattimer told him, on the way back to Widell's Haddonfield office, that Pandullo wanted $100,000 for the political powers in the county if the firm wanted the pumping station and other construction jobs. Finally, regarding this incident, Vinci testified that Pandullo suggested to him that, in order to meet his continuing obligation to "the boys," he would use certain contractors, such as Widell, in order to raise money to pay defendant and Matalucci.
The pumping station contract was bid in January 1979, and the construction contract was bid in March 1979. Widell submitted bids on both contracts.
On the pumping station bid, Widell was the second lowest bidder. However, Pandullo wanted Widell to obtain the contract, so that he could generate money through them to meet his obligation to "the boys." For reasons unrelated to this case, the lowest bid was improper and was disqualified. Pandullo testified that Lattimer approached him and stated that if Pandullo assisted Widell in getting this contract, Widell would pay him $25,000. Lattimer, on the other hand, testified that if the firm was awarded the contract, he was told that "the boys" would need an additional $25,000. Nelson's testimony supported Lattimer's version of these events.
The propriety of the low bid was eventually litigated. During that trial, Pandullo testified on Widell's behalf. Ultimately, the low bid was rejected for legal reasons, and Widell was awarded the pumping station contract.
*257 Lattimer and Nelson testified in January 1979 at a meeting between Pandullo and Lattimer, regarding the treatment plant, that Pandullo said that if Widell wanted the contract, it would have to pay "the boys" $100,000. Widell was the low bidder on the contract, and was awarded the construction job. After the bid was awarded, Vinci testified that Pandullo told him that Widell would pay $50,000 "up front" to meet its $100,000 obligation and would pay $50,000 during the course of the project. Moreover, in exchange for getting the pumping station contract, Widell would pay $25,000 "up front" and $25,000 during the course of that project.
In late spring of 1979, Widell was ready to proceed on the pumping station and treatment plant construction jobs. During this period, Pandullo was constantly pressing Widell for money pursuant to their agreement. Widell was resisting this pressure and eventually a meeting was held with Vinci, Pandullo, Lattimer and Nelson. Vinci made clear, during the meeting, that he controlled the MUA, but that he also worked for others, whom he did not identify. When Pandullo asked when Widell would start paying the money it "owed the boys," he was told Widell could not afford to pay cash out of its business. Eventually, however, in June 1979, Widell agreed to generate some cash to pay off Vinci and Pandullo.
Widell began to consider ways in which it could raise money to meet its obligation to "the boys." Pandullo met with Lattimer and Nelson regarding specific methods to raise cash for these payments. Pandullo saw his involvement as facilitating assistance to the firm in return for money which would be given to Vinci. Pandullo testified that his involvement in this regard was part of his continuing obligation to Vinci, defendant and Matalucci. Nelson, on the other hand, testified that Widell made the payments to insure job peace, given the power of PQA, the consulting engineer.
The specific methods Widell used to generate cash for payment to "the boys" are not particularly relevant to the issues on this appeal. A few examples suffice. For instance, change orders *258 with respect to the pumping station were approved to make the job less costly. Widell retained the "savings," and used them for payoffs. Pandullo suggested that Widell use subcontractors who had relationships with Vinci and "the boys." If Widell did not use these suppliers, it could "pick up" the obligation those subcontractors owed to Vinci and "the boys" and use its own subcontractors. In such cases, Widell would be responsible for those subcontractors' obligations.
In any event, Widell was able to either raise cash through these methods or assume responsibility for another firm's obligation to "the boys" to meet its obligation. Pandullo was told that the money Widell was paying would go to Vinci and defendant. This process was used to make the payments. Vinci would contact Pandullo, and ask when he could expect a payment from Widell. Pandullo testified that he would then contact Lattimer and tell him he was getting pressure from Vinci for a payment. He said that Lattimer decided the amount of the payment. Lattimer testified that Pandullo set the amount of the payoff. But Lattimer would tell Nelson the amount needed, and Jackie Homa, Widell's secretary, would obtain the cash at a bank. Pandullo would then call Lattimer and arrange the meeting for the payoff.
Pandullo testified that on four to six occasions, he acted as a go-between on these payoffs. Although the details of the payoffs differed somewhat in the testimony of Pandullo, Nelson, Lattimer and Vinci, an early payment was apparently made in July 1979. Lattimer met Pandullo at a restaurant in South Jersey, and gave him between $15,000 and $25,000. On a second occasion, in August 1979, Lattimer placed about $40,000 in an empty golf-ball box, which he gave to Pandullo and Vinci at a restaurant where Nelson and he arranged to meet them. Pandullo testified that Vinci was not present at this latter meeting, but that Pandullo drove to Vinci's house after the meeting concluded, and gave Vinci the box. Pandullo never counted the money Widell gave him. He simply passed along the package, either an envelope or box, to Vinci.
*259 Pandullo testified that he was told by Vinci that through early 1980, $35,000 had been paid. After this, Lattimer testified that he paid Pandullo money on two other occasions; on April 30, 1981, he paid $5,000, and in July 1981, he paid $20,000 to $25,000. In total, Lattimer testified that $100,000 was paid. Lattimer left Widell in 1981, after the July payment. Nelson also testified that three or four payments were made in the spring and fall of 1980, and that after Lattimer left, one final payment was made directly to Vinci in October 1981. Vinci testified that Nelson gave him money on two occasions.
During Vinci's testimony regarding the payments he received, the prosecutor marked for identification personal diaries Vinci kept in 1979 and 1980. Defense counsel did not object. The prosecutor then questioned Vinci regarding notations in the diaries which ostensibly related to the payoffs described. This was done in an effort to corroborate Vinci's testimony.
Although defendant contends that Vinci was the only witness who tied him directly into this conspiracy, the record shows otherwise. For example, in conversations which Lattimer and Nelson had with Pandullo and Vinci, the latter two would frequently refer to Phil (Matalucci) and Tony (Catanoso). Phil and Tony were not further identified during the meetings. Lattimer also testified that at a meeting in the summer of 1979, with Pandullo and Nelson to discuss payment issues, defendant and Vinci were pointed out. Moreover, Pandullo testified that Vinci told him at one point that $75,000 of the Widell payoff money went to defendant, and at another point told Pandullo that the money Widell was paying was for defendant and Matalucci. Pandullo further testified that he checked with defendant several times to make sure defendant was receiving the payoff money from Vinci. Defendant acknowledged receipt of the money through body movements, not with specific words.
Vinci further testified extensively on defendant's involvement in the conspiracy. As noted, Vinci testified that Pandullo told him he wanted to use Widell, along with certain other contractors, so *260 Pandullo could meet his obligation to defendant and Matalucci. Moreover, Vinci testified that between 1979 and 1981, each time he spoke or met with defendant and Matalucci, they would ask what money had been paid, and when the next payment could be expected. Defendant and Matalucci constantly pressured Vinci in this regard. Vinci also testified that after Widell was awarded the site preparation contract, defendant immediately contacted Vinci and told him that F & S was to receive that job.
John Sykes started his own business in 1977 in North Carolina marketing the services of firms like PQA. He contacted Pandullo to see if PQA would be interested in having its services marketed in North Carolina. Sykes eventually became the president of PQA in 1978 after a merger with Sykes's company.
In late 1978 or early 1979, Sykes met with defendant to discuss the project and PQA's involvement in it. During the discussion, defendant told Sykes that he planned to retire to Florida in a couple of years, showed Sykes a brochure of a condominium in which he was interested, and asked if Sykes would help him buy it. Sykes refused defendant's request and told Pandullo what happened. Pandullo told Sykes that the firm did owe an obligation to defendant, and that Sykes, as PQA's new president, would have to handle the situation. Sykes testified, however, that despite his involvement with PQA from 1979 to 1981, he did not learn of PQA's involvement in the conspiracy until Pandullo told him in either 1980 or 1981 while they were in North Carolina. At that meeting, Pandullo told Sykes he had just delivered a briefcase of money to a public official in the county, Vinci. Sykes said that he disapproved of this payoff. He began to negotiate either the sale of his interest in PQA, or the purchase of PQA entirely. In 1983 Sykes acquired Pandullo's interest in PQA.
Defendant did not testify. He called several character witnesses. In rebuttal, the State called Eugene Sanguinetti, a building subcode official in North Wildwood, where defendant served as Mayor. Sanguinetti testified that, in his opinion, defendant was not honest. Sanguinetti also testified that defendant had "favorite *261 sons," and that, in his opinion, defendant was not a fair dealing person.
Defendant also called two investigators with the Division of Criminal Justice. One investigator, William Southwick, an auditor who assisted in the investigation of the MUA, reviewed defendant's finances, and concluded that sufficient funds existed from which defendant could have purchased the Florida condominium, the subject of Sykes's testimony. He also found no undisclosed or unaccounted for assets and no transfers of money from Vinci to defendant. However, he acknowledged that cash transfers might not appear in defendant's financial records. Investigator Albert Palentchar, who had expertise in financial and accounting methods, and who assisted in the investigation of Vinci, Pandullo and the MUA, testified that Vinci possessed unaccounted-for cash of approximately $30,000. Palentchar also said that he was instructed not to continue his investigation of Vinci after he learned of the alleged kickback scheme involving upwards of $100,000, since Vinci had become a cooperating witness.
There was also testimony regarding the sentencing "deals" arranged for Vinci, Pandullo, Lattimer and Nelson in return for their cooperation with the State. Lattimer, a co-defendant in the case, agreed to testify for the State in exchange for entry into the Pretrial Intervention Program (PTI) in Cumberland County. Nelson Widell was also charged in the indictment and admitted into PTI in exchange for his testimony. He acknowledged that if he successfully completed the PTI Program, the indictment would be dismissed.
Pandullo did not tell any law enforcement officials about the alleged bribery scheme until after he was indicted. In return for his testimony in this case, he was admitted into PTI. He was also granted "use" immunity with respect to any testimony at trial. Finally, after Vinci was indicted, he reached an agreement with the Attorney General's office limiting his total exposure to incarceration for the charges against him to one year. At the time of this trial, he was awaiting sentencing.
*262 On the basis of this evidence, despite many contradictions in the testimony of the witnesses regarding the precise details of the alleged conspiracy, the jury found defendant guilty on three counts: conspiracy, bribery and official misconduct.

III
Defendant first contends that his prosecution on this indictment now under appeal, SGJ-168-86-9 (the first indictment) returned on September 10, 1986, was barred because of his February 10, 1988 acquittal on the two charges of conspiracy and soliciting and accepting gifts as a public servant on indictment SGJ-182-87-3 (the second indictment), returned on May 19, 1987. As noted, Judge Serata denied the defendant's March 1988 motion for dismissal on double jeopardy grounds in June 1988 and again denied a renewed motion on March 6, 1990  just before this trial.
Indictment SGJ-182-87-3, the second indictment, generally charged a conspiracy among three named defendants  the defendant-appellant Catanoso, Ralph Evans, a freeholder and the Board's liaison to the MUA, and Robert Anzalone, the vice-chair of the MUA. Specifically, the indictment alleged that the three conspired between May 1, 1981 and March 5, 1982 in Cape May County to knowingly and improperly confer gifts on public servants (N.J.S.A. 2C:27-6) and to knowingly tamper with or fabricate physical evidence (N.J.S.A. 2C:28-6). The latter charge was dismissed on motion before verdict. All three defendants were acquitted by the jury on the two remaining counts, conspiracy and receipt of gifts. Both indictments were obtained by the Division of Criminal Justice of the Attorney General's Office.
The overt acts of the May 1981 to March 1982 conspiracy involved events leading to an airplane trip to Montreal, Canada, on July 8, 1981 from Cape May. We have reviewed the record of the trial of the second indictment, resulting in acquittal. The State's theory was that this was a golfing and site-seeing junket to Montreal and St. John's, Newfoundland, rather poorly disguised as an inspection trip of a leaf-composting plant in Toronto. The *263 participants were defendant-appellant Catanoso, Evans, Anzalone and Vinci. The participants returned from the junket on July 12, 1981. The airplane, a Lear jet, was supplied by an affiliate of PQA at the cost of $12,011, paid by PQA.
Defendant, as Director of the Board of Chosen Freeholders, was charged with soliciting and accepting the gift of the trip "to influence the performance of official duties." Defendant allegedly initiated the solicitation for the junket in early May 1981 in a discussion with Vinci. The Canadian junket conspiracy allegedly also included a letter written in March 1982 to cover up the true purpose of the trip, the attempted coverup thus extending the conspiracy into 1982.
The State claimed that defendant Catanoso told Vinci that he wanted to go golfing in Montreal and asked Vinci if he could make an airplane available. Defendant reminded Vinci that he earlier had flown on a plane owned by PQA to Wayne, New Jersey, for a golf outing. Vinci passed the request on to Pandullo who was reluctant but agreed to arrange the airplane trip. His reason, as the prosecutor argued in the 1988 trial's summation was: "Because, he [Pandullo] testifies, that he's in a precarious position at this point in time [May 1981], and Mr. Marinakis [executive director of the MUA] is starting to suggest that perhaps other engineers should do some of the work." And Pandullo "knows who's the influential force behind the commissioners, the MUA." Vinci was moved to cooperate in setting up the junket because his reappointment as Chairman of the MUA was coming up very soon. As the prosecutor urged upon the jury: "The flight was provided simply to insure that he [Pandullo] would continue in his office as consulting engineer and that Vinci stay in office [as MUA chairman]." Judge Serata denied defendant's motion for dismissal on double jeopardy grounds because "a comparison of the two indictments reveals two separate and distinct conspiracies and thus the required nexus between the two prosecutions has not been shown."
*264 The SGJ 168-86-9 indictment, the first indictment, and the conviction under appeal, charged conspiracy to commit bribery (N.J.S.A. 2C:27-2); official misconduct (N.J.S.A. 2C:30-2), and illegally conferring gifts on public servants (N.J.S.A. 2C:27-2). The first indictment named numerous conspirators as defendants: Anthony T. Catanoso, Dacon Corporation, Theordore DeSantis, Foundations and Structures, Inc., Clyde Lattimer, William E. Monaghan, Philip Matalucci, Pandullo Quirk Associates, Nelson Widell, and Wilbert Widell. The first indictment did not name Evans and Anzalone, the other two defendants named in the second indictment. The appellant Catanoso was the only commonly-indicted co-conspirator in the two indictments. The overt acts in the first indictment charged a long-term scheme to extract large sums of money illegally, perhaps as much as $500,000 to $600,000, from the Ocean City project for the benefit of several defendants named in that indictment, including appellant, in return for their political sponsorship.

III A. Constitutional Double Jeopardy
The New Jersey constitutional prohibition against double jeopardy is "coextensive in application" with the Fifth Amendment of the United States Constitution. State v. Rechtschaffer, 70 N.J. 395, 404, 360 A.2d 362 (1976) (citations omitted). The Fifth Amendment provides: "Nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." Our State Constitution, art. I, ¶ 11, provides: "No person shall, after acquittal, be tried for the same offense."
The Fifth Amendment guarantee against double jeopardy protects criminal defendants against a second prosecution for the same offense after acquittal, against a second prosecution for the same offense after conviction, and from multiple punishments for the same offense. State v. Biegenwald, 110 N.J. 521, 532, 542 A.2d 442 (1988). Hence, the State cannot carve up a single conspiracy into several smaller ones for the purpose of multiple prosecutions against the same defendant. State v. Ferrante, 111 N.J. Super. 299, 303, 268 A.2d 301 (App.Div. 1970).
*265 The United States Supreme Court recently clarified, to some extent, its position on the issue of constitutional double jeopardy and conspiracy. United States v. Felix, 503 U.S. ___, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992). In that case, defendant's drug operation in Oklahoma was raided and shut down by federal agents. Defendant then arranged for the purchase of chemicals and equipment necessary to restart the operation in Missouri. He was arrested and convicted in Missouri for attempted drug manufacturing. Subsequently, defendant was indicted in Oklahoma relating to his prior drug operation in that state. The Tenth Circuit held that the second indictment should have been dismissed on double jeopardy grounds because two of the overt acts charged in the Oklahoma conspiracy indictment were based on conduct which was the subject of the prior Missouri conviction. 503 U.S. at ___, 112 S.Ct. at 1379, 118 L.Ed.2d at 30.
The Supreme Court reversed the Tenth Circuit. The Court noted that the actual crimes charged in the two indictments were different as to time and place. Also, no common conduct linked the alleged activities in the two states. 503 U.S. at ___, 112 S.Ct. at 1382, 118 L.Ed.2d at 33. Hence, none of the offenses charged in the Oklahoma indictment were the same as the offenses prosecuted in Missouri. Ibid.
In reaching its decision, the Court clarified its previous holding in Grady v. Corbin, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990). Specifically, the Felix Court held that a mere overlap in proof between two prosecutions did not by itself establish a double jeopardy violation. 503 U.S. at ___, 112 S.Ct. at 1382, 118 L.Ed.2d at 34. Hence, the introduction of relevant evidence of misconduct from one case in the trial of a second case did not constitute a second prosecution for the same conduct and did not violate double jeopardy principles. Ibid. The Court also held that a substantive crime and the conspiracy to commit that crime do not constitute the same offenses for double jeopardy purposes, since the essence of a conspiracy is the agreement to commit the crime, not the commission thereof. 503 U.S. at ___, 112 S.Ct. at *266 1384-1385, 118 L.Ed.2d at 36. The Felix Court rejected a broad interpretation of the language in the earlier Grady decision; that is, the double jeopardy clause bars a prosecution in which, to establish an essential element of an offense charged in that prosecution, the government will prove conduct constituting an offense for which the defendant has already been prosecuted. 503 U.S. at ___, 112 S.Ct. at 1383-1385, 118 L.Ed.2d at 35-37. The Court in Felix rejected an interpretation of Grady in which the "same offense" language of the double jeopardy clause was replaced with a test based on whether the two prosecutions involved the "same conduct." 503 U.S. at ___, 112 S.Ct. at 1385, 118 L.Ed.2d at 37. See also United States v. Dixon, 509 U.S. ___, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (specifically overruling Grady v. Corbin).
Several statements by the U.S. Supreme Court in United States v. Felix, supra, 503 U.S. ___, 112 S.Ct. 1377, 118 L.Ed.2d 25, demonstrate that the mere existence of some similarity or relationship between the criminal conspiracies and the crimes charged in two indictments is not automatically fatal to successive or bifurcated prosecutions. The Court said: "Our precedents hold that a mere overlap in proof between two prosecutions does not establish a double jeopardy violation" id. at ___, 112 S.Ct. at 1382, 118 L.Ed.2d at 34, and "[b]ut long antedating any of these cases, and not questioned in any of them, is the rule that a substantive crime, and a conspiracy to commit that crime, are not the `same offense' for double jeopardy purposes." Id. ___, 112 S.Ct. at 1384, 118 L.Ed.2d at 36.
Our Supreme Court has also considered similar double jeopardy issues. In State v. Dively, 92 N.J. 573, 581, 458 A.2d 502 (1983), the Court held that both prongs of a two-prong test must be met to prove a double jeopardy violation. Those prongs are: (1) whether each offense charged in the separate indictments requires proof of an additional fact not necessary for the other offense (the "elements" test); and (2) whether the evidence actually used to establish guilt in the first prosecution is identical to that which will *267 be used in the second (the "same evidence" test). Ibid. However, in State v. DeLuca, 108 N.J. 98, 107, 527 A.2d 1355, cert. denied, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987), the Court held that the second prong is an alternative to the first; thus, if either is met, the double jeopardy violation has been established. See also, State v. Yoskowitz, 116 N.J. 679, 691-93, 563 A.2d 1 (1989). If the same evidence used in the first prosecution is the sole evidence in the second, the latter prosecution is barred. Ibid.
The Third Circuit applies a "totality of the circumstances" test in analyzing a defendant's double jeopardy claim under the "same evidence" test. State v. Liotard, 817 F.2d 1074, 1077-78 (3d Cir.1987). Under this test, a defendant will be successful on his double jeopardy claim if he can establish that:
(a) the "locus criminis" of the two alleged conspiracies is the same ...;
(b) there is a significant degree of temporal overlap between the two conspiracies charged ...;
(c) there is an overlap of personnel between the two conspiracies ...; and
(d) The overt acts charged and the role played by the defendant according to the two indictments are similar. [Ibid. (citations omitted).]
The latter test was adopted by our Supreme Court, in the context of deciding whether an indictment was duplicitous. State v. New Jersey Trade Waste Assoc., 96 N.J. 8, 23-24, 472 A.2d 1050 (1984). Our Court noted that it was not essential that every factor be present. Id. at 24, 472 A.2d 1050. Hence, as we recently noted, no single test has achieved universal acceptance. Rather, the tendency is to avoid "technisms and inflexibility" in favor of the more important considerations of fairness and fulfillment of reasonable expectations in light of the law. State v. White, 248 N.J. Super. 515, 518, 591 A.2d 954 (App.Div. 1991).
In the second indictment SGJ-182-87-3, returned subsequent to indictment SGJ-168-86-9 now under appeal, defendant was charged with second-degree conspiracy, gifts to public servants, and perjury. The conspiracy charge alleged that from May 1, 1981 to March 5, 1982, in Cape May County and Canada, defendant conspired with others to obtain gifts in violation of N.J.S.A. 2C:27-6. The State charged that in May 1981, defendant first *268 spoke with Vinci, who thereafter spoke to Pandullo, regarding an airplane trip to Montreal, Canada. On July 8, 1981 defendant and others boarded a plane provided by PQA and flew to Montreal. On July 11, 1981 defendant and others then flew, in the PQA airplane, from Montreal to St. John's, Newfoundland, and returned to New Jersey on July 12. The gifts to public servants count charged defendant with soliciting and accepting the trip which had a value in excess of $12,000, in exchange for influence over the performance of defendant's official duties.
However, the first indictment, involved in the present appeal, charged defendant with conspiracy to commit bribery and official misconduct, and with committing those substantive offenses, all in connection with the award and performance of the site preparation phase contract on the Ocean City project, and with respect to the approval of change orders and substitutions by which Widell raised the cash to pay off Vinci, defendant and others. The conspiracy allegedly took place between April 1, 1978 and May 14, 1986. The evidence at trial actually established that Widell last made a payment to Vinci on defendant's behalf in October 1981.
We conclude that under the so-called "elements" test, different proofs were required under the two indictments. The evidence necessary to convict defendant pursuant to the first indictment, considered on this appeal, regarded his role in soliciting very substantial bribes from PQA and Widell, among others, in order to assure his cooperation with respect to the Ocean City project. More specifically, the evidence regarded his role with respect to the splitting of the site preparation and plant construction contract into two bids, and the approval of change orders and substitutions submitted by Widell. The second indictment involved defendant's solicitation and receipt of an airplane trip to Canada provided by PQA. Although the second indictment alleged that the conspiracy and overt acts charged against defendant principally occurred during May through July 1981, a period encompassed by the larger conspiracy alleged in the first indictment, the activity alleged in the second indictment was subsumed in the time span of *269 the first indictment by only a short period. Moreover, the first indictment alleged activity taking place solely in Cape May County while the second indictment alleged activity which took place in Cape May County and Canada. As in Felix, supra, 503 U.S. at ___, 112 S.Ct. at 1382, 118 L.Ed.2d at 33, the alleged crimes committed in the two indictments were quite different in time and place, and no common overt conduct linked these alleged crimes. The only links were the identity of some of the unindicted co-conspirators and Catanoso's alleged participation as a common conspirator and a defendant under both indictments.
Defendant argues that the same conduct was the subject of both conspiracies, i.e., conspiracy to accept bribes; the fact is that the two conspiracies involved entirely different objects: one involved receipt of an airplane trip; the other involved a much more grandiose conspiracy to solicit and accept very large bribes specifically connected with the Ocean City project.
Different evidence was needed and used to prosecute the two indictments. The first indictment involved evidence regarding defendant's solicitation of money from Vinci, PQA and Widell. The second indictment required evidence of defendant's solicitation from PQA of a plane trip to Canada. Although defendant's solicitation in each was related to the wider plot involving the County's and the MUA's $200 million sewerage projects, the precise objects of the two conspiracies alleged in the two indictments obviously were vastly different. Defendant was not prosecuted twice for being illicitly greedy in general, but rather for two specific and very different schemes illustrative of his alleged dishonesty. Indeed, a motion for joinder might have precipitated Evid.R. 55 objections from defendant.
We conclude that this case differs from a case such as State v. Ferrante, supra, 111 N.J. Super. at 303-04, 268 A.2d 301, in which the defendant was first convicted for bribing a police officer. The second indictment, for conspiracy to obstruct justice, involved virtually the same overt acts as alleged in the first indictment, and the latter prosecution was barred by the double jeopardy clause. *270 Thus, the two indictments, although technically different, were essentially identical, and involved the same conduct, bribery of the same officer. Id. at 304, 268 A.2d 301. In the case before us, however, defendant was involved in soliciting entirely different gifts or cash considerations. There is no suggestion that the second indictment alleged that defendant solicited money in return for his initial approvals and for approvals of change orders submitted by Widell and PQA, which were the subject of the first indictment. The two indictments did not allege the same overt acts; in this respect they also were not essentially identical.
Similarly, this case differs from State v. New Jersey Trade Waste Assoc., supra, 96 N.J. at 25, 472 A.2d 1050, where the Supreme Court held that the two conspiracies alleged were not distinct and separate. Here, however, although the general goal of the two conspiracies, i.e., to obtain something valuable in return for defendant's political cooperation, was the same, the fact is that the allegations involved two entirely separate methods of reaching that goal, i.e., an airplane trip to Canada from PQA as a general favor for political help, and the receipt of money from Widell and PQA over several years in return for defendant's cooperation with approvals, change orders and substitutions of Widell's contracts.
This case appears more akin to State v. Yormark, 117 N.J. Super. 315, 284 A.2d 549 (App.Div. 1971), certif. denied, 60 N.J. 138, 139, 286 A.2d 511, 512 (1972), cert. denied sub nom., Mulvaney v. New Jersey, 407 U.S. 925, 92 S.Ct. 2459, 32 L.Ed.2d 812 (1972). There, the defendants were acquitted after being tried on a six-count indictment: three counts alleged conspiracy, and three counts alleged obtaining money by false pretenses from an insurance company. The indictment alleged that the activity took place between September 1966 and February 1968. A second indictment alleged that the defendants were engaged in similar activities from August 1967 to February 1968, within the time period alleged in the prior indictment. We held that the agreements underlying the various conspiracies in the first prosecution were separate and distinct from those charged in a latter indictment. *271 The conspiracies were not tied together as part of one all-inclusive combination directed to achieving a single result; rather, each had its own distinct end. Id. at 333, 284 A.2d 549. Similarly, here, the two conspiracies defendant was charged with had their own ends; one involved an airplane trip to Canada for defendant and several others, and the other cash money in return for project approvals, change orders and substitutions. Although both Cape May County project conspiracies involved the receipt of consideration in return for political cooperation, we conclude that, as in Yormark, the two conspiracies were separate, and not necessarily a part of an all-inclusive conspiracy directed towards one result.
Under the "totality of circumstances" test, we find no merit to the defendant's double jeopardy claim. First, the two conspiracies did not take place in the same location; one involved locations in Canada (Montreal and St. John) and a few sites in Cape May County, while the other, in reality, was located throughout Cape May County, but principally in Ocean City. Second, although there was some concurrency in time, this was a fairly short overlap; the first indictment alleged activity from April 1978 to May 1986; the second involved activity from May 1981 to March 1982. Third, the identity of the co-conspirators involved in the first indictment were not at all the same as those in the second; appellant Catanoso was the only conspirator named as a defendant in both indictments. Finally, the overt acts were entirely different, although defendant assumed the same basic role in both; he pressured Vinci to extract valuable consideration from the engineers and contractors in return for his cooperation. The defendant has not persuaded us that the "totality of circumstances" test weighs in his favor on the claim that this was a fragmented prosecution of a single conspiracy. We view this as best-described as an overarching conspiracy charged in the first indictment with a satellite but essentially independent conspiracy charged in the second indictment. The charges, conduct and evidence were sufficiently different to defeat the defendant's double jeopardy plea. One plot was to extract a succession of substantial bribes *272 over several years; the other was to extract a single junket for favorable consideration in renewal of appointments.

III B. Mandatory joinder under R. 3:15-1 and N.J.S.A. 2C:1-8(b).
Defendant contends that concepts of mandatory joinder should have resulted in dismissal of the first indictment now under appeal. We disagree. Defendant raised this objection in a pretrial motion to dismiss this indictment after his acquittal at the first trial.
R. 3:15-1(b) provides that:
Except as provided by R. 3:15-2(b), a defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court.
Similarly, N.J.S.A. 2C:1-8(b) provides that:
[A] defendant shall not be subject to separate trials for multiple criminal offenses based on the same conduct or arising from the same episode, if such offenses are known to the appropriate prosecuting officer at the time of the commencement of the first trial and are within the jurisdiction and venue of a single court.
No motion for joinder of the two indictments for a common trial was ever made by defendant. See R. 3:15-1(a). He does not give any explanation why he did not move for joinder of these two State grand jury indictments, both of which were obtained and prosecuted by the Division of Criminal Justice. Nor does the State.
Although the court rule and statute have slightly different terminology, there is no substantive difference when applying them. State v. Pillot, 115 N.J. 558, 567, 560 A.2d 634 (1989); State v. Muscia, 206 N.J. Super. 551, 554, 503 A.2d 346 (App.Div. 1985). Essentially, the rule and statute provide that a defendant should not be subject to separate trials for multiple offenses known to the prosecuting attorney and within the same court's jurisdiction, where the offenses are based on the same conduct or arise from the same criminal episode or are based on a series of events motivated by a common purpose or plan and which result *273 in repeated commission of the same offenses. State v. Yoskowitz, supra, 116 N.J. at 701, 563 A.2d 1; State v. Gregory, 66 N.J. 510, 519-20, 333 A.2d 257 (1975); State v. Colbert, 245 N.J. Super. 53, 58, 583 A.2d 1145 (App.Div. 1990). Hence, the determinative question is whether defendant's criminal activity constituted criminal offenses based on the same conduct, or arising from the same criminal episode. Pillot, supra, 115 N.J. at 567, 560 A.2d 634. In Colbert, we said in addressing this issue, a court should apply a flexible approach, by considering the nature of the offenses, the time and place, whether evidence submitted on one charge is necessary or sufficient to convict on another, whether one indictment is an integral part of a larger scheme, the intent of the accused, and the consequences of the criminal actions. Colbert, supra, 245 N.J. Super. at 58, 583 A.2d 1145.
We conclude that Judge Serata properly rejected defendant's claim in this regard. Although both indictments involved defendant's attempt to solicit something of value in return for his political cooperation, as we have pointed out, the specific objects of the two conspiracies were quite different. Although there was a temporal overlap on the two charges, it was relatively brief. Different evidence was needed to convict defendant on the two indictments, the conspiracies alleged in the two indictments were not just integral parts of a larger, overall scheme but constituted separate acts of concupiscence.
Defendant's alleged criminal activity here did not consist of criminal offenses based on the same conduct but on separate and distinct types of conduct. This case is more similar to State v. Pillot, supra, where the defendant committed six different robberies against six different victims in six different locations in two counties over a nine-week period. The only circumstance tying the crimes together was the defendant's modus operandi. Joinder was not compelled. 115 N.J. at 567, 560 A.2d 634. In our case, defendant committed separate acts of conspiracy and bribery, against different victims (PQA in one case; Widell and others in another), in different locations (Canada and Cape May County) *274 over a period of years. Moreover, even though defendant's modus operandi, selling his political influence, was fairly similar under both indictments, the character of the bribes was different: money in one case, a junket and a plane trip in another.
Defendant surely had no reasonable expectation that the first trial on the July 1981 Canadian golfing junket conspiracy would discharge his criminal responsibility for the lengthy conspiracy arising from the Ocean City project charged in the first indictment. To the extent that a defendant's subjective expectations that he need stand trial only once on a criminal charge under double jeopardy policy and N.J.S.A. 2C:1-8(b) are relevant, we find that defendant could not claim reasonable expectations in this scenario. He did not ask for a joinder so we assume that he was satisfied at the time to proceed with separate trials, as contemplated by N.J.S.A. 2C:1-8(c) and R. 3:15-2(b). This is not a situation where sequential indictments fractionalized one criminal episode, ostensibly to wear a defendant down and perhaps wear him out. E.g., State v. Gregory, supra, 66 N.J. 510, 513, 333 A.2d 257 (1975). The defendant's expectations here seemingly materialized into the realization of his own choice. Defendant could have requested a joinder of the indictments if he desired. We will not countenance his first eschewing joinder and now exclaiming double jeopardy. The policy of fairness must prevail over "technisms." See State v. Tsoi, 217 N.J. Super. 290, 295, 525 A.2d 1116 (App.Div. 1987).

III C. Statutory Double Jeopardy under N.J.S.A. 2C:1-9 and -10.
Defendant also argues that, pursuant to N.J.S.A. 2C:1-9 and -10, the first indictment should have been dismissed after acquittal on the second indictment.
N.J.S.A. 2C:1-9(a) provides:
A prosecution of a defendant for a violation of the same provision of the statutes based upon the same facts as a former prosecution is barred by such former prosecution under the following circumstances:

*275 a. The former prosecution resulted in an acquittal by a finding of not guilty by the trier of fact or in a determination that there was insufficient evidence to warrant a conviction. (emphasis added).
Similarly, N.J.S.A. 2C:1-10 provides:
A prosecution of a defendant for a violation of a different provision of the statutes or based on different facts than a former prosecution is barred by such former prosecution under the following circumstances:
a. The former prosecution resulted in an acquittal or in a conviction as defined in section 2C:1-9 and the subsequent prosecution is for:
....
(3) [t]he same conduct, unless (a) the offense of which the defendant was formerly convicted or acquitted and the offense for which he is subsequently prosecuted each requires proof of a fact not required by the other and the law defining each of such offenses is intended to prevent a substantially different harm or evil.... (emphasis added).
N.J.S.A. 2C:1-9(a) bars retrial for a separate offense the proofs for which are identical to those for an offense for which the defendant was previously acquitted. Cannel, New Jersey Criminal Code Annotated, comment 3 to N.J.S.A. 2C:1-9 (1992-93). N.J.S.A. 2C:1-10(a) also has been deemed interchangeable with constitutional double jeopardy protections and need not be treated separately. Cannel, New Jersey Criminal Code Annotated, comment 4 to N.J.S.A. 2C:1-10 (1992-93).
In State v. Yoskowitz, supra, the Supreme Court held that N.J.S.A. 2C:1-10(a)(3) applies to situations where the offenses arise from the same course of conduct not subject to mandatory joinder. 116 N.J. at 698, 563 A.2d 1. Same conduct, as used in this context, is defined as identical conduct. State v. DiVentura, 187 N.J. Super. 165, 172, 453 A.2d 1354 (App.Div. 1982), certif. denied, 93 N.J. 261, 460 A.2d 666 (1983).
As stated earlier, we conclude that defendant's identical conduct did not precipitate the two indictments. Rather, two distinct and separate corrupt efforts were alleged in the two indictments, even though both efforts arose from defendant's position as Cape May County freeholder director, and his resultant power and influence with respect to the MUA. The proofs required to convict defendant were vastly different under the two indictments. Neither *276 N.J.S.A. 2C:1-9 nor N.J.S.A. 2C:1-10 compel a dismissal of the first indictment and vacation of the conviction. We find no more solace for defendant in the statutory claim than in the constitutional claim.
Finally, we find no reason to accept defendant's contention on this point that the doctrine of "fundamental fairness" should have barred a second trial, on the "overarching" conspiracy charges leveled in the first indictment. See State v. Yoskowitz, supra, 116 N.J. at 704-05, 563 A.2d 1; State v. Currie, 41 N.J. 531, 539, 197 A.2d 678 (1964). The events leading to the separate, second indictment were not sufficiently similar to invoke this doctrine.
[PAGES 39 TO 46 of this opinion treating Issues #2 to #11 HAVE BEEN REDACTED FOR PURPOSES OF PUBLICATION]
The convictions under count two, official misconduct, and count three, bribery, are merged; as modified the judgment of conviction and the sentence is affirmed.